**In re ALSTOM SA SECURITIES LITIGATION.**

No. 03 Civ. 6595 (VM).

United States District Court,
S.D. New York.

Aug. 26, 2008.

## DECISION AND ORDER

VICTOR MARRERO, United States District Judge.

Lead plaintiffs the State Universities Retirement System of Illinois ("Illinois"), the Louisiana State Employees' Retirement System ("Louisiana"), the West Virginia Investment Management Board ("West Virginia"), and the International Brotherhood of Electri-

cal Workers Local 269 ("Local 269") (collectively, "Plaintiffs"), brought this putative class action alleging that Alstom SA ("Alstom"), Alstom USA, Inc. ("Alstom USA"), Alstom Transportation Inc. ("ATI"), Pierre Bilger ("Bilger"), and Francois Newey ("Newey") (collectively, "Defendants") violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("§ 10(b)" and "§ 20(a)"), 15 U.S.C. §§ 78j(b), 78t(a). Plaintiffs' allegations are detailed more fully in the Court's prior opinions in this action, *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 346 (S.D.N.Y.2005) ("*Alstom I*"), *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433 (S.D.N.Y. 2005) ("*Alstom II*"), *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 402 (S.D.N.Y.2005) ("*Alstom III*"), and *In re Alstom SA Sec. Litig.*, 454 F.Supp.2d 187 (S.D.N.Y.2006) ("*Alstom IV*").

Plaintiffs now move, pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), to certify a class comprised of:

> [a]ll persons or entities who purchased or otherwise acquired the publicly-traded American Depositary Shares ("ADSs") of [Alstom] in the United States, and all U.S., Canadian, French, English or Dutch persons or entities who purchased or otherwise acquired the common shares or other equity securities of Alstom on foreign markets, during the period August 3, 1999 to August 12, 2003 inclusive (the "Proposed Class Period") (the "Proposed Class").[1]

(Pls.' Mem. of Law In Supp. of Their Motion for Class Certification ("Pls.' Mem.") at 1.) For the reasons discussed below, Plaintiffs' proposed class definition is modified to delete the inclusion of French persons or entities as to all Defendants, English persons or entities as to Alstom, and Dutch persons or entities as to Alstom. Additionally, the Proposed Class Period is modified to cover the period from August 3, 1999 to August 6, 2003, but the motion is otherwise granted. The Court finds that the proposed class, modified as indicated, satisfies all of the requirements of Rule 23(a) and pertinent requirements of Rule 23(b).

---

**1.** Plaintiffs excluded all persons and entities con- nected with Defendants from the Proposed Class.

## I. BACKGROUND

Alstom is a limited liability company organized under the laws of France with operations around the world, including within the United States. Alstom's securities were actively traded during the Proposed Class Period on several securities exchanges throughout the world, including the New York Stock Exchange ("NYSE"), the Euronext ("Euronext"),[2] and the London Stock Exchange.

Plaintiffs, who were purchasers of Alstom's equity securities, allege a common course of wrongful conduct by Defendants during the Proposed Class Period, through which Defendants allegedly artificially inflated the price of Alstom's securities by making materially false and misleading statements relating to: (1) the demand and revenue earned from Alstom's sale of cruise ships (the "Marine Fraud"); and (2) the profitability of ATI (the "ATI Fraud") (collectively, the "Frauds"). Although the Frauds differed in their specifics, Plaintiffs assert that they were part of an overall scheme by Defendants to present Alstom as a financially sound business with strong revenues, robust demand for its products, and no hidden contingent liabilities. Plaintiffs assert that Alstom began making corrective disclosures to the market regarding the ATI Fraud on June 30, 2003 and August 6, 2003 (the "Corrective Disclosures"). Plaintiffs further assert that Alstom lost approximately 93 percent of its market capitalization over the Proposed Class Period.

On August 29, 2003, the first of several lawsuits alleging that Alstom violated the federal securities laws was filed. By order dated January 7, 2004, the Court appointed Plaintiffs to serve as co-lead plaintiffs for the Proposed Class. Plaintiffs filed a Consolidated Amended Complaint, dated June 18, 2004 (the "CAC"), and Defendants moved to dismiss the CAC. In three orders dated December 22, 2005, as detailed in *Alstom I, Alstom II,* and *Alstom III,* the Court denied in part and granted in part Defendants' motion to dismiss, familiarity with which is presumed.

## II. DISCUSSION

### A. *STANDING*

As a threshold matter, the Court must first determine whether Plaintiffs have standing to bring this action, because the absence of Article III standing deprives the Court of jurisdiction to address the merits of Plaintiffs' motion for class certification. To establish Article III standing, a plaintiff must demonstrate the existence of a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F.3d 82, 85 (2d Cir.2006) (*quoting Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The "irreducible constitutional minimum" of standing contains three elements: (1) the plaintiff must have suffered an "injury-in-fact," meaning an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent, not conjectural or hypothetical; (2) there must be a "causal connection" between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Court's threshold inquiry into standing "in no way depends on the merits of the [plaintiff's claim]." *Denney v. Deutsche Bank AG,* 443 F.3d 253, 265 (2d Cir.2006). In the Second Circuit, a court may certify a class even if one of the lead plaintiffs does not have standing to bring every available claim. *See Hevesi v. Citigroup, Inc.,* 366 F.3d 70, 82 (2d Cir.2004) (finding that lead plaintiff will not have standing to sue on every claim in some cases); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 245 F.R.D. 147, 163 (S.D.N.Y.2007) (*"Flag Telecom "*) (noting that "[i]t is axiomatic, however, that lead or representative plaintiffs in class actions are not required to have stand-

**2.** Euronext is a European stock exchange that was formed from the merger of the Amsterdam Stock Exchange, the Brussels Stock Exchange, and the Paris Bourse. *See* Vanessa Fuhrmans and Silvia Ascarelli, *Hostile Bid Next Step in Bourse Battle? Troubled London Stock Exchange the Prize,* The Globe and Mail, Sept. 22, 2000, at B10.

ing to bring all claims asserted in the Complaint").

Here, Plaintiffs have sufficiently established standing. First, Plaintiffs, who held equity interests in Alstom, allege that Alstom lost approximately 93 percent of its market capitalization over the Proposed Class Period, which sufficiently demonstrates an injury in fact. Second, Plaintiffs have sufficiently demonstrated, for the purposes of an inquiry into standing, that "certain of the ATI-related disclosures were associated with statistically significant price reactions," which would "imply that investors suffered harm due to the alleged ATI-related wrongdoing." (Supplemental Aff. of Gregg A. Jarrell, dated Mar. 5, 2008 ("Jarrell Supplemental Aff.") ¶ 5.) Although Defendants argue that any loss sustained by the equity holders was the result of events other than the alleged Frauds, that is an argument regarding the merits of Plaintiffs' claims and not proper for review when addressing standing.[3] Third, because Plaintiffs' alleged injury is monetary in nature, it is likely, and not merely speculative, that Plaintiffs' alleged injury will be addressed by a favorable ruling.

Defendants rely on *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885, 2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005) (*"AllianceBernstein"*) to support their assertion that Plaintiffs lack standing. The *AllianceBernstein* plaintiffs brought a class action against thirteen mutual funds in which they owned shares, and forty-eight in which they did not own shares. The court found that plaintiffs lacked standing to bring claims on behalf of the forty-eight funds in which they owned no shares, because as non-owners they would not be able to show any injury. In contrast, here, each of the Plaintiffs has sufficiently demonstrated for the purposes of class certification that it purchased and held an Alstom security during the Proposed Class Period. Also, Defendants implicitly concede that claims for both the Marine Fraud and ATI Fraud are adequately represented by Plaintiffs.[4]

Accordingly, Plaintiffs have sufficiently established standing to bring this action.

## B. *STANDARD OF REVIEW*

To certify the Proposed Class, Plaintiffs must satisfy all four of the requirements of Rule 23(a) and the relevant portions of Rule 23(b)(3). *See In re Livent Inc. Noteholders Sec. Litig.*, 210 F.R.D. 512, 514 (S.D.N.Y. 2002) (*"Livent "*).

To meet Rule 23(a)'s prerequisites, Plaintiffs must demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a). Rule 23(b)(3) further requires that Plaintiffs demonstrate that common questions of law or fact predominate over any questions affecting individual members and that maintaining a class action is superior to other available methods of adjudication. *See* Rule 23(b)(3).

■ Trial courts are given substantial discretion in determining whether to grant class certification because " 'the district court is often in the best position to assess the propriety of the class and has the ability ... to alter or modify the class, create subclasses, and decertify the class whenever warranted.' " *In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 301 (E.D.N.Y. 2006) (*quoting In re Sumitomo Copper Litig.*, 262 F.3d 134, 139 (2d Cir.2001) (*"Sumitomo III "*)). The Second Circuit has direct-

---

**3.** Illinois and West Virginia purchased and sold securities within the Proposed Class Period. The Court need not address the merits of the loss causation at this stage in the proceedings. *See Denney,* 443 F.3d at 265.

**4.** Although Defendants challenge whether Illinois and Louisiana properly represent the Proposed Class with claims relating to the ATI Fraud, no such challenge is made with respect to the Ma-

rine Fraud. (*See* Mem. of Law in Supp. of the Alstom Defendants' Opposition to Class Certification, dated Jan. 7, 2007, ("Defts.' Mem.") at 39–41.) Although Defendants challenge whether Local 269 properly represents the Proposed Class with respect to the Marine Fraud, no such challenge is made with respect to the ATI Fraud. (*See id.*)

ed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this one involving alleged manipulation of public markets, to maximize the benefits to the public provided by class actions. *See In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 89 (S.D.N.Y.1998) (*"Sumitomo I"*); *see also In re Sumitomo Copper Litig.*, 194 F.R.D. 480, 481 (S.D.N.Y.2000) (*"Sumitomo II"*). As the Second Circuit stated in *Green v. Wolf Corp.*, " 'if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.' " 406 F.2d 291, 298 (2d Cir.1968) (*quoting Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir.1968)).

## C. RULE 23(a) REQUIREMENTS

### 1. Numerosity

■■■ To meet the requirements of Rule 23(a)(1), the class must be so large that joinder of all members would be impracticable (the "Numerosity Requirement"). *See Sumitomo II*, 194 F.R.D. at 482 (*citing In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir.1992)). Although precise calculation of the number of potential class members is not required, the Second Circuit has observed that "numerosity is presumed at a level of 40 members." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y.2007) (citations and quotation marks omitted) (*"Vivendi"*). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Id.* at 84 (citation and quotation marks omitted); *cf. In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 179 (S.D.N.Y.2005) (finding that a potential class of investors in publicly traded futures contracts over the course of two years satisfied the numerosity requirement).

During the Proposed Class Period, Alstom's ADSs were actively traded in the United States and its common shares were traded on Euronext in Paris, among other exchanges. Since Alstom was a publicly traded corporation with more than 280 million shares outstanding at the end of the Proposed Class Period and approximately 2.28 billion total shares traded during the Proposed Class Period, Alstom meets the numerosity requirement with a putative potential class far greater than forty people. *See, e.g., Vivendi*, 242 F.R.D. at 84 ("With more than 107 million ADSs and approximately 1 billion ordinary shares outstanding during the relevant class period, plaintiffs have established that joinder is impracticable and that the proposed class satisfied the numerosity requirement.").

Accordingly, the Numerosity Requirement of Rule 23(a)(1) is satisfied in this action.

### 2. Commonality of Law or Fact Questions

■■■ Rule 23(a)(2) requires plaintiffs demonstrate that common issues of law or fact affect all class members (the "Commonality Requirement"), which has been characterized as a "low hurdle." *See Sumitomo II*, 194 F.R.D. at 482 (*citing In re Prudential Sec. Litig.*, 163 F.R.D. 200, 206 n. 8 (S.D.N.Y. 1995)). It is evident that common questions of law and fact exist in this proceeding. First, the claims of the Proposed Class arise from a common course of conduct by Defendants. Second, the Proposed Class will have to engage in the same detailed discovery to compile a common body of data, and the Proposed Class will have to engage in the same analysis of the data to establish the factual basis for a claim of securities price manipulation. Although the Frauds differ in their specific facts, the Frauds share numerous common factual and legal questions such as whether Defendants misled investors as to the financial condition of Alstom and artificially inflated the price of Alstom's securities.

Defendants challenge the Commonality Requirement, claiming that the potential class members comprising the ATI and Marine Frauds respectively, represent two distinct groups of shareholders founded upon two distinct courses of conduct. Defendants claim that the Commonality Requirement is not satisfied because the Frauds: (a) involved different business units; (b) con-

cerned different accounting practices; (c) occurred during different—albeit overlapping—time periods; and (d) did not share a common motive. The Court is not persuaded by Defendants' argument.

 To satisfy the Commonality Requirement, Plaintiffs need only reveal "at least a common thread which unites the several documents into one common course of action." *Fruchthandler v. Blakely*, 73 F.R.D. 318, 321 (S.D.N.Y.1976) (citation omitted). Where plaintiffs allege that class members have been injured by similar material misrepresentations and omissions, the Commonality Requirement is satisfied. *See, e.g., Vivendi*, 242 F.R.D. at 84. As noted above, Plaintiffs allege that certain actions and statements of Defendants were intended to mislead shareholders and artificially inflate the price of Alstom's securities. Therefore, there are numerous questions of law and fact common to the class, including: (a) whether Defendants' actions violated federal securities laws; (b) whether Defendants omitted or misrepresented material facts; (c) whether Defendants knew or recklessly disregarded that these statements were false and misleading; (d) whether the price of Alstom's securities was artificially inflated because of Defendants' alleged fraudulent scheme; and (e) the extent and appropriate measure of damages suffered by the class when Defendants' alleged fraudulent conduct was revealed.

Accordingly, because the Frauds allegedly resulted in similar types of harm [5] and were based on similar types of conduct, the Commonality Requirement is satisfied.

### 3. *Typicality*

 Rule 23(a)(3) requires that Plaintiffs' claims be typical of the class (the "Typicality Requirement"). Defendants argue that the named Plaintiffs in this proceeding do not meet the Rule 23(a)(3) Typicality Requirement because: (1) not all members of the class can assert claims based on the Marine Fraud and (2) there was no common course of conduct linking the Frauds. Defendants claim that class members have differing interests because each fraud is based on a different course of conduct and argue that this will create a disabling conflict of interest between those purchasers who pursue a claim based on the ATI Fraud as opposed to the Marine Fraud. The Court is not persuaded.

 Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. *See Sumitomo I*, 182 F.R.D. at 94. To satisfy typicality, representatives' claims need only arise from the same course of events, and each class member must rely on similar legal arguments to establish the defendant's liability. *See id.* In the case of intra-class conflicts, class certification is defeated only if such conflicts are actual—as opposed to merely speculative— and relate to the very subject matter of the suit. *See, e.g., In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 513–15 (S.D.N.Y.1996) (rejecting "the possibility of hypothetical conflicts or antagonisms among class members" as a basis to deny class certification); *In re South Cent. States Bakery Prods. Antitrust Litig.*, 86 F.R.D. 407, 418 (M.D.La.1980) (noting "there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit" to defeat class certification). Courts in this district have found that potential issues related to differential damages does not preclude class certification. *See Livent*, 210 F.R.D. at 516 (stating that "damages for each class member, assuming liability is established, will vary in accordance with the number and size of the various transactions attributable to each" and that such differences in damages " 'among the plaintiff class does not preclude typicality.' ") (*quoting Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 87 (S.D.N.Y.2001)); *see also Flag Telecom*, 245 F.R.D. at 160 (commenting that the fact that "the interests of some members of [the class] may ultimately diverge when it comes time to allocate dam-

---

**5.** Plaintiffs allege generally that the Frauds caused Alstom's securities to trade at artificially high prices.

ages" did not warrant denial of class certification) (citation omitted).

Courts have also repeatedly recognized that putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification. *See, e.g., Blackie v. Barrack,* 524 F.2d 891, 903 (9th Cir.1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable ...."); *In re Gaming Lottery Sec. Litig.,* 58 F.Supp.2d 62, 70 (S.D.N.Y.1999) ("The common questions with respect to whether misleading statements or omissions were made, whether such statements were material, and whether they were made with scienter, bind class members with more force than the varying questions related to price inflation drive them apart."); *Michaels v. Ambassador Group, Inc.,* 110 F.R.D. 84, 89–90 (E.D.N.Y.1986) (noting that any conflict of interest between class representative and members of class arising from different times of purchase and sale involve issues of damages, not liability).

In this case, Plaintiffs have a common interest in demonstrating that throughout the Proposed Class Period, the price of the stock was artificially inflated and that members of the class were injured because of the alleged materially false and misleading statements issued during either of the Frauds, forming a common course of conduct that Plaintiffs assert fraudulently portrayed Alstom as a company with greater financial and market prospects than it had in actuality. Furthermore, issues of both damages and artificial securities inflation will be primarily the domain of expert testimony, applying

standard damages methodologies. *See, e.g., In re BearingPoint, Inc. Sec. Litig.,* 232 F.R.D. 534, 544 (E.D.Va.2006) (noting that a proper determination of individual damages can be made at trial through the use of expert witnesses and does not defeat commonality). Whether a potential class member was an investor during the Marine Fraud, the ATI Fraud, or both, the Court concludes that Plaintiffs have proferred sufficient evidence demonstrating that the claims of the potential class members—namely that Defendants issued false and misleading statements that artificially inflated the price of Alstom's securities—are typical throughout the class.

To the extent that members of the Proposed Class may, at some point in the future, disagree as to the relative impact of the Frauds on the inflation of the stock price,[6] those issues may be mitigated by an allocation plan to be determined at a later stage, and do not preclude class certification at this time. *See In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 699 (S.D.Fla.2004) ("[A]llocation will become an intra-class matter accomplished pursuant to a court-approved plan of allocation, and such individual damages allocation issues are insufficient to defeat class certification."). Furthermore, any future intra-class conflict relating to damages could be mitigated by certifying subclasses pursuant to Rule 23(c)(4).

Accordingly, Plaintiffs have sufficiently demonstrated that the potential class members' claims satisfy the Typicality Requirement of Rule 23(a)(3).

### 4. *Adequacy*

 Rule 23(a)(4) requires that the representative of the parties will "fairly and adequately protect the interests of the class" (the "Adequacy Requirement"). To meet this requirement, the lead Plaintiffs' counsel must be "qualified, experienced, and general-

---

**6.** For example, West Virginia and Illinois, which allegedly have sustained greater injuries from the Marine Fraud than the ATI Fraud, have an incentive to argue that more of the artificial inflation of Alstom's securities occurred by reason of the Marine Fraud as opposed to the ATI Fraud.

Similarly, potential class members who allegedly sustained greater injuries from the ATI Fraud may argue that the ATI Fraud, not the Marine Fraud, was responsible for most of the artificial price inflation.

ly able to conduct the proposed litigation," and the class representatives must not have interests conflicting with the class. *Livent*, 210 F.R.D. at 517 (citations and quotation marks omitted). The Court finds that both requirements are satisfied in the instant matter.

Plaintiffs' attorneys [7] have vigorously pursued these claims to date and have adequately represented classes in other securities class actions involving fraudulent misrepresentations made by public companies for the alleged purpose of manipulating the price of securities. Therefore, counsel for the Plaintiffs are qualified for the purposes of Rule 23(a)(4).

Additionally, the named Plaintiffs' interests do not conflict with the interests of the putative class members. As noted above, the presence of both Marine and ATI Fraud members in the Proposed Class, even if such presence may potentially lead to future disputes over the allocation of damages, does not warrant denial of class action certification. *See Sumitomo I*, 182 F.R.D. at 92–93.

Accordingly, the Court finds that Plaintiffs have satisfied the Adequacy Requirement of Rule 23(a)(4).

### D. RULE 23(b)(3) REQUIREMENTS

■ In addition to satisfying Rule 23(a), Plaintiffs must also establish that this action is maintainable as a class action under Rule 23(b). Here, Plaintiffs seek to certify the Proposed Class pursuant to Rule 23(b)(3), which provides that an action is maintainable as a class action if "questions of law or fact common to class members predominate over any questions affecting only individual members" (the "Predominance Requirement"), and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "Superiority Requirement"). "A class certified pursuant to Rule 23(b)(3) is sometimes referred to as an 'opt-out' class because Rule 23(c)(2) mandates that members of a class certified pursuant to Rule 23(b)(3) be afforded the opportunity to 'request exclusion' from that

class." *Vivendi*, 242 F.R.D. at 90. Should the Court certify the Proposed Class, any investor—foreign or domestic—who does not opt-out of the class is bound by the final disposition of the case. *See id.*

#### 1. Predominance Requirement

■ The Predominance Requirement is a more demanding standard than the Commonality Requirement and is satisfied if the "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Id.* (*citing Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir.2002)). The Predominance Requirement is "readily met in certain cases alleging ... securities fraud." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *see also Vivendi*, 242 F.R.D. at 90.

■ For Plaintiffs to prevail on their claim under § 10(b) at trial, all members of the Proposed Class must similarly establish: (1) a material misrepresentation or omission by Defendants; (2) scienter on the part of Defendants; (3) a connection between the misrepresentation or omission and each Proposed Class member's purchase or sale of a security; (4) each Proposed Class member's reliance on the misrepresentation or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation and the loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

■ Defendants argue that the Proposed Class should not be certified because individualized questions predominate, particularly whether the respective Plaintiffs relied on the alleged misstatements and omissions. Plaintiffs counter that, to establish reliance, they intend to put forward a fraud-on-the-market theory (the "Fraud Theory"), which is "based on the hypothesis that, in an open and developed securities market, the price of

---

**7.** Plaintiffs' counsel consists of three firms: Grant & Eisenhofer P.A., Bernstein Litowitz, Berger & Grossmann LLP, and Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP, each of which has significant experience litigating securities class actions.

a company's stock is determined by the available material information regarding the company and its business," and thus, "[m]isleading statements will ... defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation and quotation marks omitted). To establish the Fraud Theory, Plaintiffs must make "some showing," *DeMarco v. Robertson Stephens Inc.*, 228 F.R.D. 468, 470 (S.D.N.Y.2005), that Defendants' alleged misstatements and omissions forming the basis of Plaintiffs' claims were "public material misrepresentations" (the "Materiality Requirement") about a stock traded on an "open and developed securities market" (the "Market Efficiency Requirement"). *Basic*, 485 U.S. at 241, 247, 108 S.Ct. 978. If Plaintiffs establish the Fraud Theory, they are entitled to a rebuttable presumption that Defendants' alleged misstatements and omissions affected the price of securities on the open market and that all class members relied on the alleged misrepresentations or omissions. *See Hevesi*, 366 F.3d at 77 (stating that establishing the fraud-on-the-market doctrine "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value"); *In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 220 (S.D.N.Y.2006) ("*Salomon*") (stating that once fraud on the market is established, plaintiffs "will be entitled to a presumption that all class members relied on the alleged misrepresentations and that common issues of reliance predominate over individual issues for purposes of Rule 23(b)").

 To fulfill the Materiality Requirement, Plaintiffs must establish that "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978 (citations and quotation marks omitted). The "[d]etermination of materiality is a mixed question of law and fact that the Supreme Court has stated is especially

well suited for jury determination." *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.1991). Defendants argue that the asserted misrepresentations in connection with the ATI Fraud were not material because the price of Alstom's securities did not suffer a statistically significant market reaction as a result of the Corrective Disclosures. However, "[t]here is no requirement that stock prices fluctuate as a result of a defendant's misstatements or omissions in order for them to be material." *Securities and Exch. Comm'n v. DCI Telecomms., Inc.*, 122 F.Supp.2d 495, 499 (S.D.N.Y.2000); *see also Bilzerian*, 926 F.2d at 1298 ("[W]hether a public company's stock price moves up or down or stays the same after the [statement is made] does not establish the materiality of the statements made.").

In the instant case, Alstom initially disclosed on June 30, 2003 that its previously reported financial results for 2003 had been artificially inflated, that it was conducting an internal investigation, and that it would record a net after-tax charge totaling €51 million for the year. On August 6, 2003, Alstom disclosed that it would reduce previously-reported earnings by an additional €100 million, resulting in a €151 million total earnings overstatement. The Court finds a substantial likelihood that, when viewed by a reasonable investor under these circumstances, a €151 million overstatement of earnings for a company of the size and financial base such as Alstom's would significantly alter the total mix of information made available to the public. *See In re Take–Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 291 (S.D.N.Y.2008) (finding that, depending on the particular facts of the case, a "significant overstatement of a company's earnings may constitute a 'material' misrepresentation"). Therefore, the Court finds that Defendants' alleged misstatements and omissions satisfy the Materiality Requirement.

 When assessing The Market Efficiency Requirement, Courts are to consider several factors, including:

(1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market mak-

ers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 303 n. 162 (S.D.N.Y.2005); *see also Cammer v. Bloom*, 711 F.Supp. 1264, 1285–87 (D.N.J.1989).

The Court finds that Plaintiffs have proffered sufficient evidence establishing the Market Efficiency Requirement. First, "the average weekly trading volume of Alstom's securities was 4.3%," (Aff. of Gregg A. Jarrell, dated June 8, 2007 ("Jarrell Aff.") ¶¶ 16–17), which far exceeds the 1–2% benchmark set forth in *Cammer*. *See Cammer*, 711 F.Supp. at 1293 ("Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one."). Second, analyst reports concerning Alstom's financial condition were generated and made publicly available on electronic databases during the Proposed Class Period by a significant number of major brokerage firms, including: Citigroup, Credit Suisse First Boston, JP Morgan, Goldman Sachs, Merrill Lynch, Morgan Stanley, ING, and UBS Equities. Third, the Court finds that because institutional investors held a substantial percentage of Alstom's securities and because these investors could easily buy and sell Alstom's securities on exchanges such as the NYSE and Euronext Paris, they have likely acted as arbitrageurs and facilitated the efficiency of the market. Fourth, Alstom generally satisfies the Securities and Exchange Commission's (the "SEC") eligibility requirements for filing an S–3 registration statement because "the value of Alstom's shares held by non-affiliates ... rang[ed] from approximately $380 million to $7.6 billion" during the Proposed Class Period, which surpasses the SEC's threshold requirement that a company has at least $75 million in stock held by non-affiliates. (Jarrell Aff. ¶ 29;) *see* 17 C.F.R. 239.13(b)(1); *In re Xcelera.com Sec. Litig.*,

430 F.3d 503, 511 n. 9 (1st Cir.2005). Fifth, Professor Gregg A. Jarrell ("Jarrell"), whom Plaintiffs retained as an expert regarding the efficiency of the markets for the equity securities of Alstom, conducted an event study comparing the day-to-day percentage change in Alstom's share prices that resulted from disclosures of new information and concluded that "Alstom was over 6 times more likely to have a statistically significant stock return on a day with news than on a day with no news." (Jarrell Aff. ¶ 43.) Therefore, the Court finds that Plaintiffs have sufficiently established the Market Efficiency Requirement.

Defendants contend that Plaintiffs cannot establish reliance through a fraud-on-the-market theory because Plaintiffs cannot prove that Defendants' alleged misrepresentations and omissions had a causal connection to the purported loss ("Loss Causation"). Specifically, Defendants assert that any decline in the price of Alstom's securities immediately subsequent to the Corrective Disclosures[8] was not statistically significant, and therefore, Plaintiffs cannot establish Loss Causation. Loss Causation, however, relates to the merits of Plaintiffs' case and Defendants have not sufficiently established how Loss Causation is related to any necessary element of Rule 23. *See Darquea v. Jarden Corp.*, No. 06 Civ. 722, 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008) (rejecting defendants' reliance on the Fifth Circuit's *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir.2007), which found that, when moving to certify a class and relying on the fraud-on-the-market theory to establish reliance, plaintiffs must demonstrate loss causation; *Darquea* instead found that, at the certification stage, plaintiffs need to show only that "they made purchases or sales in an efficient market, and need not show that they specifically relied on the allegedly fraudulent conduct"); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118–19 (S.D.N.Y.2008) (finding that certifying a class despite a lack of evidence of loss causation "appears consistent with the United States

---

8. The Corrective Disclosures relate only to the ATI Fraud and not the Marine Fraud. Defendants did not challenge the sufficiency of any loss causation with respect to the Marine Fraud at the class certification stage.

Supreme Court's decision in [*Basic*, 485 U.S. at 224, 108 S.Ct. 978]"); *In re Tyco Int'l Lmtd.*, 236 F.R.D. 62, 71 (D.N.H.2006) (noting that "[d]isputes about loss causation turn primarily on questions of fact" and that the defendant "remain[ed] free to develop the issue further during discovery and to renew its argument in a properly supported motion for summary judgment at the appropriate time"); *but see In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, No. 03 Civ. 2467, 2008 WL 512779, at *12 (S.D.N.Y. Feb. 26, 2008) (granting defendants' motion to decertify a class because of plaintiffs' failure to establish loss causation at the class certification stage).

 Even if Plaintiffs were required to establish loss causation at the class certification stage, they have sufficiently done so in this case. "[L]oss causation can be established either where ... the market reacted negatively to a corrective disclosure or ... the materialization of the risks that were concealed by the alleged misrepresentations or omissions proximately caused plaintiffs' loss." *Wagner*, 251 F.R.D. at 118–19 (*quoting In re Omnicom Group, Inc. Sec. Litig.*, 541 F.Supp.2d 546, 550–51 (S.D.N.Y.2008)). At the class certification stage, plaintiffs need only establish that they "may be able to ... prove loss causation" at trial. *Wagner*, 251 F.R.D. at 118–19 (citation and quotations marks omitted); *see also Flag Telecom*, 245 F.R.D. at 166–67 (finding that because plaintiffs could "conceivably prove loss causation, they [were] appropriately counted as members of the proposed class"). Here, Jarrell found that "certain of the ATI-related disclosures were associated with statistically significant price reactions," which would "imply that investors suffered harm due to the alleged ATI-related wrongdoing." (Jarrell Supplemental Aff. ¶ 5.) Therefore, the Court finds that Plaintiffs have sufficiently established that they could conceivably prove loss causation at trial.

 The Court concludes that questions of law and fact common to the Proposed Class predominate over any questions affecting only individual members. Plaintiffs' claims arise out of Defendants' alleged fraudulent conduct, which was directed at all in-vestors. Plaintiffs have also alleged a series of false and misleading statements and omissions by Defendants, in violation of federal securities laws, which Plaintiffs assert affected all investors. The critical issues for establishing liability in this case include whether Defendants engaged in a fraudulent scheme and made the false and misleading statements and omissions, whether those statements and omissions were material, whether Defendants acted with scienter, and whether Defendants' conduct injured those who purchased Alstom shares during the Proposed Class Period. Plaintiffs will likely rely on similar evidence when establishing each of the foregoing issues of proof at trial, and thus, common issues predominate over individual issues. *See, e.g., Salomon*, 236 F.R.D. at 218 (finding that the Predominance Requirement was met in a securities fraud action).

Accordingly, Plaintiffs have satisfied the Predominance Requirement.

### 2. *Superiority Requirement*

 When certifying a proposed class in accordance with Rule 23(b)(3), courts, pursuant to the Superiority Requirement, must consider whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3). Courts may properly consider res judicata concerns when evaluating the Superiority Requirement with respect to a proposed class that includes foreign class members. *See Vivendi*, 242 F.R.D. at 95 (stating that "res judicata concerns have been appropriately grafted onto the superiority inquiry," but that the res judicata determination should not be "dispositive without either an evaluation of the likelihood of non-recognition or a consideration of other factors which impact a determination of the superiority requirement").

Defendants assert that foreign investors should be excluded from the Proposed Class and that a United States class action is not a superior method for adjudicating Plaintiffs' claims because a resulting judgment would not be given preclusive effect by courts in France, England, the Netherlands, and Canada (collectively, the "Foreign Courts").

Plaintiffs counter that a United States class action is the superior method for adjudicating these claims and that the Foreign Courts would probably find any judgment rendered by this Court as preclusive.

In the instant matter, Plaintiffs have not sufficiently demonstrated that French courts would more likely than not recognize and give preclusive effect to any judgment rendered by this Court as against Defendants. The Court also finds that Plaintiffs have sufficiently demonstrated that English and Dutch courts would more likely than not recognize and give preclusive effect to any judgment rendered by this Court with respect to Defendants other than Alstom, but not with respect to Alstom. The Court further finds that Plaintiffs have sufficiently demonstrated that Canadian courts would more likely than not recognize and give preclusive effect to any judgment rendered by this Court as against Defendants.

a. *Standard*

Plaintiffs assert that the correct standard for assessing the likelihood of the Foreign Courts' recognition of a judgment rendered by this Court should be whether there is at least a reasonable possibility that the foreign court will find any judgment of this Court preclusive, in which case certification is appropriate, or whether the evidence establishes that there is a "near certainty" that such a judgment would not be recognized, in which case certification is not appropriate (the "Possibility Standard"). Defendants counter that the appropriate standard, as found by the *Vivendi* court, requires that Plaintiffs demonstrate that the Foreign Courts would probably recognize as preclusive any judgment rendered by this Court (the "Probability Standard").

▮▮▮ The Court finds that the Probability Standard is appropriate. In asserting the Possibility Standard, Plaintiffs rely on *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 134–35 (S.D.N.Y.2001) ("*Cromer*") and *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996 (2d Cir.1975) ("*Bersch*"). *Cromer* and *Bersch*, however, do not state a firm standard of proof for evaluating judgment-recognition issues involving foreign courts.

*See, e.g., Bersch*, 519 F.2d at 996 (stating that "while an American court need not abstain from entering judgment simply because of a possibility that a foreign court may not recognize or enforce it, the case stands differently when this is a near certainty"). A foreign court's potential nonrecognition of a United States judgment need not be a near certainty before the superiority of a United States class action is called into question. *See Vivendi*, 242 F.R.D. at 95. Similarly, a plaintiff who can demonstrate only that recognition of a United States judgment is a "mere possibility" does not necessarily establish superiority. *Id.* Instead, "[i]t seems more appropriate ... to evaluate the risk of nonrecoginition along a continuum," and if "plaintiffs are able to establish a probability that a foreign court will recognize the res judicata effect of a [United States] class action judgment, plaintiffs will have established this aspect of the superiority requirement." *Id.* (*citing In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 33 (2d Cir.2006)). To satisfy the Superiority Requirement, Plaintiffs carry the burden of demonstrating that "foreign court recognition is more likely than not," but if Plaintiffs are "unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority and, taken in consideration with other factors, may lead to the exclusion of foreign claimants from the class." *Id.* Accordingly, the Court concludes that, under the circumstances of this case, the Probability Standard is appropriate.

b. *Recognition by French Courts*

▮▮▮ Plaintiffs assert that a French court would more likely than not recognize any judgment rendered by this Court. The Court is not persuaded.

In *Vivendi*, the plaintiffs brought a securities fraud action against defendants Vivendi Universal, S.A. ("Vivendi"), which is a French corporation, and two individual defendants. The plaintiffs claimed that the defendants' materially false and misleading statements caused Vivendi's securities to trade at artificially inflated prices and moved to "certify a class pursuant to Rules 23(a) and 23(b)(3), consisting of all persons, foreign

and domestic who purchased or otherwise acquired ordinary shares or [ADSs of Vivendi] between October 30, 2000 and August 14, 2002." *Vivendi*, 242 F.R.D. at 79. *Vivendi* addressed whether courts in France, the Netherlands, and England, among others,[9] would recognize and find preclusive any judgment rendered in the United States class action. After reviewing the "voluminous competing expert declarations," the *Vivendi* court held that courts in France, the Netherlands, and England would more likely than not recognize a judgment rendered in the United States class action and certified the class to include class members that resided in those respective countries. *Id.* at 95.

French courts have not expressly determined the extent, if any, to which they would recognize a United States class action judgment involving an opt-out class. (*See* Decl. of Alexis Mourre, dated Feb. 29, 2008 ("Mourre Decl.") ¶ 8.) Because France and the United States are not party to any bilateral or multilateral convention regarding recognition and enforcement of judgments rendered in the United States, French case law regarding the recognition of a foreign judgment would govern. (*See id.* ¶ 10.) Before a French court will recognize and give preclusive effect to a judgment rendered in a foreign court, the French court will analyze the foreign judgment under the framework primarily set forth in *Munzer v. Munzer* ("*Munzer*"), which was issued by France's highest court. *See Vivendi*, 242 F.R.D. at 96; (Mourre Decl. ¶ 11.) The portion of the *Munzer* framework which is currently valid law may be summarized as follows: (1) the foreign court must have jurisdiction pursuant to French rules on conflict of jurisdictions (the "Jurisdictional Prong"); (2) the judgment of the foreign court is not contrary to international public policy (the "Public Policy Prong"); and (3) the action before the foreign court was not the result of forum shopping (the "Forum Shopping Prong"). *See Vivendi*, 242 F.R.D. at 96; (Mourre Decl. ¶ 11; Decl. of Jean–Paul Beraudo, dated Jan. 7, 2008 ("Beraudo Decl.") ¶ 16.)

### i. *The Jurisdictional Prong*

The French case of *Fairhurst v. Simitch* (Cass. le civ. Feb. 6, 1985) ("*Simitch*") holds that to satisfy the Jurisdictional Prong, the foreign decision must meet the following three conditions: (1) the case does not fall within the "exclusive jurisdiction" of a French court ("Exclusive Jurisdiction"); (2) there exists a characterized link between the case and the foreign court ("Characterized Link"); and (3) the choice of the foreign court must not be fraudulent ("Non–Fraudulent Forum"). *See Vivendi*, 242 F.R.D. at 96; (Mourre Decl. ¶¶ 13–14; Beraudo Decl. ¶ 23–24.)

### (1) *Exclusive Jurisdiction*

Under French law, a foreign court lacks jurisdiction over a matter if, pursuant to French rules governing conflicts of jurisdiction, French courts have exclusive jurisdiction over the matter. (*See* Decl. of George A. Bermann, dated Jan. 7, 2008 ("Bermann Decl.") ¶ 47.)

Defendants assert, and Plaintiffs do not dispute, that Council Regulation 44/2001 is applicable in the instant matter and holds that:

> If the parties, one or more of whom is domiciled in a Member State, have agreed that a court or courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction. Such jurisdiction shall be exclusive unless the parties have agreed otherwise.

Council Regulation 44/2001, art. 23, 2001 O.J. (L 12) 1 (the "Council Regulation"). Additionally, to comply with the Council Regulation, the agreement between the parties must be in writing or evidenced in writing. (*See* Bermann Decl. ¶ 48.) French courts have repeatedly held that if a foreign judgment is rendered in violation of a forum selection clause, which exclusively designates a French forum or even that of a third country, that is

---

9. The plaintiffs' motion for certification in *Vivendi* also included potential class members residing in Germany and Austria. Plaintiffs' motion for certification in the instant action, however, does not include potential class members residing in Germany and Austria.

sufficient to bar recognition or enforcement of the judgment by French courts. (See Supplemental Decl. of George A. Bermann ("Bermann Supplemental Decl.") ¶ 6.)

In the instant matter, Alstom's Articles of Association state that:

[A]ny disputes that may arise during the term of the company or at the time of liquidation, whether between the shareholders and the company, or among the shareholders themselves regarding corporate affairs, shall be submitted exclusively to the jurisdiction of the courts of the registered office [located in Levallois Perret, France].[10]

(Alstom's Articles of Association, tit. 8, art. 23 ("Article 23"), attached as Ex. 9 to Decl. of Kevin T. Abikoff, dated Jan. 7, 2008 ("Abikoff Decl.").) Defendants argue that a French court would refuse to recognize a judgment rendered by this Court against Alstom because operation of Article 23 and the Council Regulation grant exclusive jurisdiction over disputes between Alstom and its shareholders to French courts. The Court agrees.

Article 23 is a valid and binding forum selection clause with regard to French shareholders. Forum selection clauses, such as Article 23, are common in French companies' articles of incorporation and have been validated by French courts. (See Bermann Decl. ¶ 49 n.5.) Further, the European Court of Justice expressly found that clauses similar to Article 23 "constitute[ ] an exclusive jurisdiction clause ... and that it makes no difference that a particular shareholder had objected to the adoption of the clause or that he or she had become a shareholder only after its adoption." (See id. ¶ 49.) Further, as required by the Council Regulation, Article 23 was in writing, and the French shareholders satisfy the requirement that at least one of the parties be a domiciliary of a European Union Member State.

Plaintiffs counter that Defendants, by virtue of failing to raise the forum selection clause in a motion to dismiss, have waived any arguments related to Article 23 pursuant to Rule 12(h)(1). Plaintiffs assert that De-

fendants had not even mentioned the existence of a potentially applicable forum selection clause until January 7, 2008, after nearly four-and-a-half years of active litigation in this case, and that "an objection to improper venue is waived if it is not raised in a Rule 12(b) motion, in a responsive pleading, or in an amendment to a responsive pleading as a matter of course under Rule 15(a)." Miller v. Batesville Casket Co., 219 F.R.D. 56, 58 (E.D.N.Y.2003) (finding that failure to assert the forum selection clause resulted in waiver pursuant to Rule 12(h)(1)).

Plaintiffs, however, misconstrue the import of Defendants' Article 23 argument. Defendants are not alleging that the United States is the improper venue and that the action should be dismissed because venue more appropriately lies in France. Instead, Defendants contend, and the Court agrees, that when assessing whether a French court will recognize a judgment rendered in a United States class action against Alstom under the Superiority Requirement, Alstom's Articles of Association is an appropriate starting point. The issue currently before the Court is not whether Alstom is precluded under United States law from invoking Article 23 as a matter of proper venue but whether French investors may, subsequent to the instant case, invoke Article 23 in actions brought before a French court, thereby causing Defendants to potentially relitigate the same issues as against French class members before a French court. The French investors, who Plaintiffs assert should be certified as class members but have nonetheless been absent from this litigation to date, have a right pursuant to Article 23 to have their claims against Alstom heard exclusively in a French court. No matter how much time elapsed between the initiation of the instant action and the first time Defendants mentioned the existence of Article 23, Defendants could not waive the right of the absent French investors to invoke Article 23 before a French court.

Furthermore, contrary to Plaintiffs' assertion, it is unlikely that French courts would

---

10. The Court notes that, in Vivendi, the French corporate defendant's articles of association did not contain a clause designating exclusive juris-

diction to any particular court. See Vivendi, 242 F.R.D. at 96–97; (see also Beraudo Decl. ¶ 34.)

conclude that French investors who do not opt out of the Proposed Class would have accepted this Court's jurisdiction and tacitly waived their rights set forth in Article 23. French courts will likely not conclude that a French investor's silence in failing to opt out of a United States class action equates to waiver of the investor's Article 23 rights. (*See* Bermann Supplemental Decl. ¶ 12.)

Because a French court would likely find that it has exclusive jurisdiction over French investors' claims against Alstom, French courts would likely not recognize any judgment rendered by this Court with regard to absent French investors against Alstom. The Court notes that because Article 23 is limited to disputes involving Alstom, French courts would likely find that they do not have exclusive jurisdiction over disputes between French investors and Defendants other than Alstom (*e.g.,* Alstom USA, ATI, Newey, and Bilger), and therefore the Court will continue the analysis of whether French courts would likely recognize a judgment rendered against Defendants other than Alstom. Accordingly, any class the Court certifies will not include French investors' claims against Alstom.

### (2) *Characterized Link*

Even in the absence of a valid forum selection clause designating French courts as the exclusive forum for the disputes at issue here, French courts will not recognize the foreign court as having adequate jurisdiction unless there is a Characterized Link, or substantive connection, between the foreign forum and the underlying dispute. (*See* Bermann Decl. ¶ 53.) In assessing whether the Characterized Link requirement is met, the issue is not which court (*i.e.,* the French court or the foreign court) was more appropriate. Rather, the question is whether the foreign court's jurisdiction was "not inappropriate." (Mourre Decl. ¶ 40); *see Vivendi,* 242 F.R.D. at 97. Although there is no precise definition of what constitutes a Characterized Link, some authorities have likened it to the United States' concept of subject matter jurisdiction. *See Vivendi,* 242 F.R.D. at 97.

A French court would likely find that this Court has an adequate substantive connec-

tion satisfying the Characterized Link requirement with regard to the ATI Fraud, which is the only portion of the Frauds for which Plaintiffs are seeking to certify a multi-national class. In *Alstom I,* the Court noted that "with respect to the ATI Fraud, all of the allegedly fraudulent conduct occurred within the United States," ATI was located in New York, and "the fraud, if any in fact occurred, was concocted and executed within ATI" and then "sent abroad to be published and thus mislead investors." 406 F.Supp.2d at 395–97. Accordingly, a French court would likely find that these same connections adequately link this Court and the ATI Fraud, concluding that this Court was not an inappropriate forum with respect to the Plaintiffs' ATI fraud claims.

### (3) *Non–Fraudulent Forum*

The final requirement of the *Simitch* test is that "Plaintiffs' choice of a United States court must not have been fraudulent." *Vivendi,* 242 F.R.D. at 98. To be a Non–Fraudulent Forum under French law, the foreign judgment must not have been obtained through deceitful maneuvers, and the plaintiffs "must not have manufactured jurisdiction in order to choose a more favorable forum when French law should have applied." *Id.* Defendants do not contest this element, and the Court is not aware of sufficient evidence demonstrating that Plaintiffs engaged in deceitful maneuvers or manufactured jurisdiction as a way to choose a more favorable forum than France. Accordingly, a French court would likely find that Plaintiffs' choice of a United States court was not fraudulent.

#### ii. *The Public Policy Prong*

Even if a foreign court's judgment satisfies the Jurisdictional Prong, French courts may not recognize or give such judgment preclusive effect if it offends French public policy so as to breach one of the most fundamental principles of the French legal order. (*See* Bermann Decl. ¶ 66; Mourre Decl. ¶ 55.) Defendants assert that French courts would "deem it contrary to French [public policy] to recognize and give preclusive effect to an adverse [United States] class action judg-

ment against an absent French claimant so as to bar that claimant from relitigating his or her claim in [a French court]." (Bermann Decl. ¶ 67.) The Court agrees.

Plaintiffs assert that, "although France has not adopted the equivalent of the Federal Rules of Civil Procedure, French domestic law itself provides for the bringing of collective or representative actions in a number of different contexts." (Lead Pls.' Reply in Support of Their Motion for Class Certification, dated Mar. 7, 2008, at 24;) *see also Vivendi*, 242 F.R.D. at 100–101 (describing examples of French procedures that allow collective actions). This assertion, however, misses the key issue, which is not whether French law allows for collective actions generally, but rather whether a French court would determine that the opt-out mechanisms of the United States' class action framework—particularly that absent class members who do not opt out of the class will be bound by any judgment—violates French public policy.

A French court would likely conclude that any judgment rendered by this Court involving absent French class members offends public policy because absent French investors did not consent to this Court's jurisdiction over their claims and the United States' class action procedure would deny them an adequate opportunity to participate in the litigation. (*See* Bermann Supplemental Decl. ¶ 22.) The French Constitutional Council (the "Constitutional Council"), which is the sole French entity authorized to declare the constitutionality of domestic legislation, ruled in a case involving a challenge to the constitutionality of a French statute authorizing trade unions to bring suit on behalf of individual members, that for the law to comply with the French Constitution it must include the following stringent conditions: "(1) that any individual [union member] be guaranteed actual personal notice in fact of the proceeding before being included in it;" (2) "that each [union member] retain the right to determine how his or her interest should be represented in the proceeding;" and (3) "that each employee be entitled to freely terminate his or her involvement in the action at any point in time prior to judgment." (Bermann

Decl. ¶ 95 (*citing* Decision no. 89–257 of July 25, 1989 ¶¶ 24–26).) These strict conditions demonstrate the constitutional significance of notice, consent, and party autonomy in the French legal system. Additionally, every French statute allowing collective litigation has been "accompanied by specific guarantees designed to safeguard consent and party autonomy," but which is "wholly absent from the 'opt-out' model." (Bermann Supplemental Decl. ¶ 26.)

Furthermore, recent legal developments in France further illustrate that a French court would likely find that the opt-out mechanism of United States' class actions would offend French public policy. A French government-sponsored working group (the "Working Group") in 2005 was charged with developing a bill addressing group litigation issues. The Working Group stated that only opt-in types of class actions would be considered because "[l]aw professors are quasi-unanimous to consider that the case-law of the [Constitutional Council], grounded in the individual's freedom to go to court, prohibits the introduction of an opt-out class action in France." (Bermann Decl. ¶ 131.) Also, in a May 16, 2006 interview, Guy Canivet ("Chief Justice Canivet"), who held the position equivalent to Chief Justice for France's highest court, stated that while he supported the extension of collective action proceedings in France, he would not support opt-out class actions because "[t]he exclusion option ('opt out') is too far removed from [France's] own legal reflexes, and even dangerous" in that "[i]t seems ... very difficult to hold someone bound to a legal decision in which he did not willingly participate." (*Id.* ¶ 99.)

Additionally, the French Ministry of Justice, Department of Civil Matters and of the Seal, by letter dated April 3, 2007 (the "Ministry of Justice Letter"), stated that "[t]he Constitutional Council requires that any person associated with a class action procedure 'has been put in a position to give his consent in full knowledge of the case and that he may maintain the freedom to personally conduct the defense of his interests and to put an end to this action.'" (Ltr. from French Ministry of Justice to Vivendi Universal SA, dated

Apr. 3, 2007, attached as Ex. 13 to Abikoff Decl.) The Ministry of Justice Letter further stated that "[t]he opt out mechanism ... does not comply with the constitutional rules established" by the Constitutional Council." (*Id.*) Further, on August 16, 2007, the Constitutional Council rendered a decision upholding the right of French unions to call a strike on their members' behalf but limited the unions' right to commence legal action on behalf of their members. (*See* Bermann Supplemental Decl. ¶ 28.) The commentary to the Constitutional Council's decision stated that a union may bring a representative legal action only where the member has individually consented to the suit with full knowledge based on sufficient and personalized information. (*See id.*) The Constitutional Council further stated that " '[i]n the absence of the observance of this individualized consent [to sue], which does not exist, for example, in the Anglo–Saxon mechanisms of 'opt-out' class actions, the individual would, abusively, be deprived of a right in violation of the Constitution.' " (*Id.* (*quoting Les cahiers du Conseil Constitutionnel* No. 23.))

Finally, the Attali Commission, which was appointed by French President Nicolas Sarkozy, issued its final report on the subject in January of 2008, "stating that any proposed consumer class action legislation could only be based on an 'opt-in' model if it were to be consistent with French constitutional principles." (*Id.*)

These recent legal developments demonstrate that French authorities have repeatedly rejected the adoption of an opt-out class action system in France because that type of system violates French constitutional principles and public policy. Under the circumstances presented by the instant matter, the issues of right to individual consent and party autonomy in litigation likely embody fundamental French constitutional values in accordance with principles of universal justice. (Bermann Decl. ¶ 110.) French authorities' rejection of opt-out class action mechanisms thus provide further evidence suggesting that a French court would likely not recognize a judgment of this Court if the class included absent French investors.[11]

### iii. *Forum Shopping*

The final prong of the *Munzer* test—that Plaintiffs did not engage in fraudulent forum shopping—was addressed in the Court's analysis of the Jurisdictional Prong and need not be readdressed at this point. *See, e.g.,* *Vivendi,* 242 F.R.D. at 102.

After examining the expert declarations and considering the parties' arguments, the Court concludes that Plaintiffs have not sufficiently demonstrated that French courts would more likely than not recognize and give preclusive effect to any judgment rendered by this Court involving absent French class members. Finding otherwise would expose Defendants to the possibility that they may have to relitigate the same or similar issues before a French court. Accordingly, the Court will not certify a class which includes absent French class members.

### c. *Recognition by English Courts*

"There is no clear authority addressing the res judicata effect of a [United States] class action judgment in England," which is an issue of English common law. *Vivendi,* 242 F.R.D. at 102; *see also* (Decl. of Professor Jonathan Harris, dated Nov. 2, 2007 ("Harris Decl.") ¶ 30.) English courts, however, have developed a framework for adjudging the jurisdictional competence of foreign courts, which focuses on the circumstances of the defendant and not those of the claimant. (*See* Harris Decl. ¶ 31.) More specifically, "English courts will regard the overseas court as jurisdictionally competent either if the defendant had the requisite territorial

11. The Court notes that the *Vivendi* court concluded that a French court would not find that a United States opt-out class action would violate French public policy because, at least in part, there was at that time an "ongoing debate in legal and business sectors" regarding the possibility of French authorities adopting an opt-out framework. *Vivendi,* 242 F.R.D. at 101. *Vivendi,* however, was issued on May 21, 2007, which was prior to the issuance of the Ministry of Justice Letter, the Constitutional Council's August 16, 2007 decision, and the Attali Commission's final report in 2008, all of which expressly rejected opt-out mechanisms of class actions as contrary to French Constitutional principles.

connection with the foreign state," which is satisfied if a corporate defendant maintains a "fixed place of business ... at the [corporate defendant's] own expense from which it has carried out its own business in the overseas jurisdiction," or "if the defendant submitted to proceedings in that state," which includes but is not limited to "voluntarily pleading to the merits." (*Id.* ¶¶ 14, 16, 18.) "No other basis of jurisdictional competence in a foreign court can be found at common law," and if the foreign judgment meets the basic requirements for recognition and enforcement, the English court will likely consider two defenses—"that the foreign judgment is in breach of natural justice" or that "it is contrary to English public policy." (*Id.* ¶ 20.)

To be considered a breach of natural justice, the English courts again focus on the defendant, determining whether the defendant had the opportunity to adequately defend himself by having "been served with proper notice of the proceedings, been allowed properly to arrange his defence, and that the procedures of the foreign court must have been acceptable." (*Id.* ¶ 23.) English courts have rarely refused to recognize an *in personam* foreign judgment because it was contrary to English public policy, and although there is no formal analytical framework for determining a violation of England's public policy, " '[t]he usual colourful examples are an order to pay damages for breach of a contract to kidnap or to sell narcotics, or those based on openly racist laws.' " (*See id.* ¶¶ 27–28, 82) (*quoting* Adrian Briggs et al., Civil Jurisdiction and Judgments 557 (4th ed.2005).)

i. *Effect of Article 23 in English Courts*

■■■ Plaintiffs concede that should an action be brought against Alstom in England, the English court, pursuant to Article 23, would "dismiss any such case against Alstom in favor of the selected French court." (Pls.' Reply 27; *see also* Decl. of Samuel Polonsky, dated Dec. 20, 2007 ("Polonsky Decl.") ¶ 15.7.) As discussed above, a French court pursuant to Article 23 and the Council Regulation would more likely than not refuse to recognize a judgment rendered by this Court against Alstom. Because Article 23 is limited to disputes involving Alstom, English courts would likely not dismiss any such claims pursuant to Article 23 brought against Defendants other than Alstom (*e.g.,* Alstom USA, ATI, Newey, and Bilger) in favor of the French courts, and therefore the Court will analyze whether English courts would likely recognize a judgment rendered by this Court against Defendants other than Alstom.

ii. *Claims Brought Against Defendants Other Than Alstom*

■■■ Plaintiffs assert that if English investors, who were absent from the instant action but nonetheless bound by any judgment rendered by this Court, brought an action in England against Defendants other than Alstom, an English court would recognize this Court's judgment and find it entitled to preclusive effect in England. The Court agrees. Defendants have maintained extensive operations in the United States, and Defendants have pled voluntarily on the merits, which, under English common law, sufficiently renders them within the Court's jurisdiction.

Defendants counter that limiting the jurisdictional competency analysis to only defendants under English common law is a byproduct of the fact that historically it has been the defendant who is absent from the foreign litigation and who challenges the preclusive effect of a judgment rendered by a foreign court. Defendants assert that there is "no policy justification for affording unwilling plaintiffs ... less protection than unwilling defendants from an unacceptable assertion of jurisdiction by federal courts" and argue that the relevant question for determining foreign judicial competency under English common law should be whether the absent *party*, not necessarily the defendant, had the requisite territorial connection with the foreign state. (Defts.' Mem. at 13.) Defendants, in support of this assertion, rely on *Campos v. Kentucky & Indiana Terminal R.R. Co.,* 2 Lloyd's Rep. 459 (1962) ("*Campos* "), where an English court denied res judicata effect of a class action judgment rendered by a United States court, noting in dictum that "in accordance with English private international law, a foreign judgment

could not give rise to a plea of *res judicata* in the English courts unless the party alleged to be bound had been served with process which led to the foreign judgment." (Bermann Decl. ¶ 162 (*citing Campos* ).)

The Court, however, is not persuaded. The *Campos* dictum, although relevant, was not the holding of the English court and was included in the decision even though "the point was not fully argued before [the English court]." (*Id.* (*citing Campos* ).) Conceivably, the English common law framework for assessing the preclusive effect of foreign judgments may be modified in the future to require that the foreign court have proper territorial connections with the absent party, but English common law, as currently interpreted and applied, focuses the analysis solely on the territorial connections of the defendant. (*See* Harris Decl. ¶ 31; *see also Vivendi*, 242 F.R.D. at 103 ("There is no requirement, express or implied, that class members, foreign or domestic, must appear or be served in order to be bound.").

Furthermore an English court is unlikely to find a judgment rendered by this Court as inconsistent with natural justice or contrary to England's public policy. With regard to natural justice, Defendants were served with proper notice of the proceedings, were allowed to arrange their defenses through filing a motion to dismiss and opposing class certification, and have not objected to the procedures of this Court as being unacceptable. With regard to public policy, the Court does not find that the circumstances underlying the instant matter are typical of the extreme circumstances in which the public policy defense has been raised successfully in English courts.

After examining the expert declarations and considering the parties' arguments concerning English law, the Court concludes that Plaintiffs have sufficiently demonstrated that English courts would more likely than not recognize and give preclusive effect to any judgment rendered by this Court involving absent English class members against Defendants other than Alstom. Accordingly, the Court will certify a class which includes English class members with claims against Defendants other than Alstom.

#### d. *Recognition by Dutch Courts*

##### i. *Effect of Article 23 in Dutch Courts*

Plaintiffs concede that should an action be brought against Alstom in the Netherlands, a Dutch court, pursuant to Article 23, would "dismiss any such claims that might be filed in the Netherlands in deference to the courts of France." (Pls.' Reply 29.) As discussed above, a French court pursuant to Article 23 and the Council Regulation would more likely than not refuse to recognize a judgment rendered by this Court against Alstom. Because Article 23 is limited to disputes involving Alstom, Dutch courts would likely not dismiss any such claims brought against Defendants other than Alstom (*e.g.,* Alstom USA, ATI, Newey, and Bilger) pursuant to Article 23 in favor of the French courts. Therefore, the Court will analyze whether Dutch courts would likely recognize a judgment rendered by this Court against Defendants other than Alstom.

##### ii. *Claims Brought Against Defendants Other Than Alstom*

█ A foreign judgment will not be recognized under Dutch law unless the foreign court based its jurisdiction on an "internationally acknowledged ground, as understood in the Netherlands." (Bermann Decl. ¶ 193.) Plaintiffs, relying primarily on the January 25, 2007 Amsterdam Court of Appeals decision *In re Dexia Bank Nederland N.V.,* rekestnummer 1783/05 (Amsterdam Court of Appeals, Jan. 25, 2007) ("*Dexia* "), assert that a Dutch court would likely recognize a judgment rendered by this Court as based on an internationally acknowledged ground. At issue in *Dexia* was whether the Mass Damage Act (the "Damages Act"), which the Dutch legislature enacted in 2005, comported with the Dutch Constitution and public policy. (*See* Decl. of Hans Smit, dated Mar. 6, 2008 ("Smit Decl.") ¶ 57.) The Damages Act provides for "judicial examination and approval of agreements between representatives of organizations, acting on behalf of all claimants, and defendants, that are intended to effectuate a dispositive settlement of all of the claimants' claims." (*Id.* ¶ 58.) The Damages

Act provides the opportunity for potential settlement beneficiaries to opt out and not be bound by the settlement's terms. (*See id.*) "[P]arties who do not take affirmative steps to opt out are bound by the court's decision approving the settlement." (*Id.*) Since the Dutch legislature enacted the Damages Act, three potential settlements were submitted for judicial approval, with Dutch courts approving two settlements. (*Id.*)

In *Dexia*, pursuant to the Damages Act, a special association was created that represented approximately 300,000 proposed class members and sought judicial approval of a settlement agreement regarding more than $1.5 billion worth of bank transactions. (*Id.* ¶ 59.) The Dutch court approved the settlement and found Dexia liable for part of the losses suffered by its customers. (*Id.*) Several members of the class objected to the settlement, arguing that "binding members of the class who had not opted out was contrary to fundamental concepts of local law and procedure, and violated the European Human Rights Convention and the Dutch Constitution." (*Id.* ¶ 60.) The *Dexia* court rejected such arguments, ruling that class settlements were "justified by the public interest in effectuating efficient settlement of multiple claims" and benefitted society by "avoiding costly, lengthy, and multiple proceedings and in obtaining realistic compensation in an efficient manner." (*Id.* ¶ 61 (*citing Dexia* ¶¶ 5.11, 5.12, 5.13).) The *Dexia* court reiterated that class members were free to opt out and that the Damages Act "effectuated an 'honest' balance between the public interest and the rights of the individual member of the class." (*Id.* (*citing Dexia* ¶¶ 5.11, 5.12, 5.13).) The *Dexia* court rejected the arguments that the Damages Act, specifically its opt-out mechanisms, violated the Dutch Constitution and concluded that the Damages Act was "not incompatible 'with any treaty provision applicable in The Nederlands,'" such as the European Convention on Human Rights. (*Id.* ¶ 62 (*quoting Dexia* ¶ 5.15).)

In the instant matter, Plaintiffs have sufficiently demonstrated that a Dutch court would more likely than not recognize a judgment rendered by this Court. Defendants argue that *Dexia* is distinguishable from the instant case because: the Damages Act permits collective settlements, not adversarial litigation; *Dexia* did not rule on binding absent class members to a judgment rendered by a foreign court; and that for a Dutch court to recognize a foreign judgment, the foreign court's jurisdiction must be based on an internationally acknowledged ground. The Court is not persuaded.

The Damages Act, although not identical to United States class actions in certain respects, is still relevant to the instant matter because it demonstrates the Dutch authorities' willingness to adopt opt-out class mechanisms, thereby providing evidence that a Dutch court may recognize a foreign judgment involving similar opt-out characteristics. *Dexia* is likewise relevant because it establishes the Dutch courts' likelihood for recognizing opt-out mechanisms as generally consistent with Dutch treaties and constitutional principles. The *Dexia* court rejected similar public policy and constitutional arguments as those asserted by Defendants in the instant action and found persuasive the policy rationales which are generally consistent with United States class actions, such as balancing the public interest of avoiding costly, lengthy, and multiple proceedings with the rights of individual class members. Based on the foregoing, the Court finds that Dutch courts would likely conclude that this Court based its jurisdiction on an "internationally acknowledged ground." (Bermann Decl. ¶ 193.)

After examining the expert declarations and considering the parties' arguments concerning Dutch law, the Court concludes that Plaintiffs have sufficiently demonstrated that Dutch courts would more likely than not recognize and give preclusive effect to any judgment rendered by this Court involving absent Dutch class members against Defendants other than Alstom. Accordingly, the Court will certify a class which includes Dutch class members with claims against Defendants other than Alstom.

### e. *Recognition by Canadian Courts*

 Plaintiffs assert that Canadian law recognizes opt-out class actions and that several courts have certified classes which in-

cluded Canadians as lead plaintiffs or class members. *See, e.g., In re Royal Ahold N.V. Sec. & ERISA Litig.,* 219 F.R.D. 343, 353 (D.Md.2003); *In re Cable & Wireless, PLC Sec. Litig.,* 217 F.R.D. 372, 376 (E.D.Va. 2003). Defendants counter that Plaintiffs have not carried their burden of demonstrating that Canadian courts would recognize a judgment rendered by this Court because none of the cases cited by Plaintiffs contain any serious analysis of Canadian judgment-recognition law and Plaintiffs did not provide any declarations from Canadian law experts. Defendants further assert that, pursuant to Article 23, Canadian courts would dismiss any suit filed against Alstom in deference to French courts.

 The Court finds that Plaintiffs have sufficiently demonstrated that Canadian courts would more likely than not recognize and give preclusive effect to a judgment rendered by this Court. When determining foreign law, courts "may consider any relevant material or source," including determinations by other courts, and the fact that United States courts have generally certified proposed classes which included Canadian lead plaintiffs and class members, is particularly persuasive. Fed.R.Civ.P. 44.1. Although plaintiffs often submit expert declarations regarding issues of foreign law, such declarations are not necessary for plaintiffs to carry their burden of establishing aspects of foreign law. *See id.*

Furthermore, the Court is not persuaded that a Canadian court would rely on Article 23 and dismiss any action brought by a Canadian shareholder against Alstom. With respect to Canadian courts, as opposed to the evidence submitted regarding English and Dutch law, Defendants have not submitted sufficient evidence demonstrating that a Canadian court would find Article 23 valid and binding, thereby requiring dismissal of any case brought by a Canadian shareholder against Alstom in deference to French courts.

The Court concludes that Plaintiffs have sufficiently demonstrated that Canadian courts would more likely than not recognize and give preclusive effect to any judgment rendered by this Court involving absent Canadian class members against Defendants. Accordingly, the Court will certify a class which includes Canadian class members.

## E. CLASS PERIOD

 The parties dispute the closing date of the Proposed Class Period. Plaintiffs assert that the Proposed Class should close on August 11, 2003 because that is the date upon which the SEC announced it was upgrading the Alstom investigation from an informal inquiry to a formal investigation (the "August 11 Announcement"). Defendants counter that the Proposed Class Period should close on June 30, 2003, the date that Alstom revealed to the public that they had made a €51 million accounting error and would be conducting an internal review (the "June 30 Announcement"). The Court, however, finds that the Proposed Class Period should close on August 6, 2003, the date Alstom revealed to the public that it had made a €151 million accounting error (the "August 6 Announcement").

 In the case of a securities fraud action, "[t]he limitations period begins to run when the plaintiff 'obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" *Shah v. Meeker,* 435 F.3d 244, 249 (2d Cir.2006) (*quoting Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.1992)). Furthermore, given the inherently factual nature of these types of disputes, courts repeatedly have refused to shorten a class period based on alleged inquiry notice. *See, e.g., In re Interpublic Sec. Litig.,* No. 02 Civ. 6527, 2003 WL 22509414, at *5 (S.D.N.Y. Nov. 6, 2003); *Nathan Gordon Trust v. Northgate Exploration,* 148 F.R.D. 105, 108 (S.D.N.Y.1993). In securities class action claims, a proposed class should close when "the facts which underlie the gravamen of the plaintiff's complaint [no longer] represent a reasonable basis on which an individual purchaser or the market would rely." *In re Data Access Sys. Sec. Litig.,* 103 F.R.D. 130, 143 (D.N.J.1984).

Defendants assert that the appropriate date for closing the Proposed Class is June

30, 2003. Citing *In re LTV Sec. Litig.*, 88 F.R.D. 134, 138–39 (N.D.Tex.), they urge the Court to close the Proposed Class on this date because Alstom indicated that it would be conducting an internal review. *LTV*, however, is distinguishable from the instant case because, although the *LTV* defendants did not announce a definitive charge for the fraud, they indicated the existence of a fraud of unknown extent and requested suspension of trading on their shares for ten days, placing investors on notice of a potential wide-ranging fraud. *See id.* at 147–48. On June 30, 2003, Plaintiffs in the instant matter received knowledge that Alstom had been alerted to alleged accounting improprieties relating to a single railcar contract at its ATI unit, that Alstom was conducting an investigation into this matter, and that it was recording a net after tax charge of €51 million. At that time, neither the full financial impact of the alleged improprieties nor the fact that it was allegedly attributable to fraud by Alstom senior corporate officials had been revealed. Plaintiffs in this action did not become aware of the full extent of the alleged ATI Fraud until the August 6 Announcement, which informed the public of the additional components of the alleged ATI Fraud, namely that multiple contracts were involved and an additional €100 million error had occurred, which increased the total accounting error to €151 million.

After the August 6 Announcement, Plaintiffs had received sufficient notice regarding the facts giving rise to the ATI Fraud, which in the exercise of reasonable diligence, would have led to actual knowledge. Accordingly, the Court concludes that the Proposed Class should properly be closed on August 6, 2003.

### III. ORDER

For the reasons discussed above, it is hereby:

**ORDERED** that the motion (Docket No. 206) of lead plaintiffs the State Universities Retirement System of Illinois, the Louisiana State Employees' Retirement System, the West Virginia Investment Management Board, and the International Brotherhood of Electrical Workers Local 269 for class certification pursuant to Federal Rule of Civil Procedure 23 is granted as modified herein.

**SO ORDERED.**