Honorable Consuelo B. Marshall, United States District Judge
The matter before the Court is Plaintiff's Motion For Class Certification (the *1119 "Motion"). (Dkt. No. 95.) The Motion is fully briefed.
I. BACKGROUND
The operative complaint, filed by Lead Plaintiff Stratesis, LLC, asserts two causes of action: (1) violation of Sections 10(b) of the Securities Exchange Act (the "Act"), 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5 ; and (2) violation of Section 20(a) of the Act, 15 U.S.C. § 78t(a). (Dkt. No. 94.) This case is based on two alleged theories of securities fraud: (1) "UTi told investors that UTi's 1 View rollout [a new freight forwarding system] was going well, while its invoicing delays were in fact putting the company in mortal danger" (the "slow invoice theory"); and (2) "UTi told investors the company's internal controls over financial reporting [through its Oracle system] were functioning effectively, while they were actually suffering from a material weakness" (the "accounting problems theory"). (Dkt. No. 72.)
II. LEGAL STANDARD
Federal Rule of Civil Procedure 23(a) requires that a proposed class satisfy the following four requirements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). In addition, the proposed class must satisfy one of the three options under Rule 23(b)(1), (2) or (3). Here, Plaintiff relies on Rule 23(b)(3), which allows the Court to certify the class if following elements are satisfied: (1) questions of law or fact common to class members predominate over questions affecting only individual class members (i.e., predominance); and (2) the class action is superior to other available methods of adjudicating the controversy (i.e., superiority). Fed. R. Civ. P. 23(b)(3).
III. DISCUSSION
A. Class Definition
Plaintiff's Motion seeks an order certifying a class of "all persons and entities who purchased shares of UTi Worldwide, Inc., ("UTi" or the "Company") common stock during the period from March 28, 2013 through February 25, 2014, inclusive, (the "Class Period") and were damaged thereby." Excluded from the class are Defendants, officers and directors of UTi, members of the immediate families of the Individual Defendants, and affiliates of the corporate Defendant UTi.
At the hearing on the Motion, the parties stated they had no objection to revising the class definition as "all persons and entities who purchased shares of UTi Worldwide, Inc., ("UTi" or the "Company") common stock during the period from March 28, 2013 through February 25, 2014, inclusive, (the "Class Period") and were damaged by the alleged false and misleading statements." Accordingly, the proposed class definition is so modified.
B. Rule 23(a)
Plaintiff submits evidence demonstrating Rule 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements are satisfied. Defendants do not dispute these requirements are met. Accordingly, the Court finds Rule 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements are satisfied.
C. Rule 23(b)(3)
1. Superiority
Plaintiff submits evidence demonstrating Rule 23(b)(3)'s superiority requirement is satisfied. Defendants do not dispute this requirement is met. Accordingly, the Court finds Rule 23(b)(3)'s superiority requirement is satisfied.
*1120 2. Predominance
The predominance requirement is meant to "tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation, but it scarcely demands commonality as to all questions." Comcast Corp. v. Behrend , 569 U.S. 27, 41, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) (internal quotations and citation omitted). For the predominance requirement, "a significant aspect of the case [must be present that] can be resolved for all members of the class in a single adjudication" so as to justify "handling the dispute on a representative rather than an individual basis." Hanlon v. Chrysler Corp. , 150 F.3d 1011, 1022 (9th Cir. 1998).
Defendants argue Rule 23(b)(3)'s predominance requirement is not satisfied because: (1) Plaintiff's evidence is insufficient to support a presumption of reliance; and (2) Plaintiff's "proof of a 'common damages methodology' " fails to propose a damages methodology that is consistent with Plaintiff's theory of liability as required under Comcast Corp. v. Behrend , 569 U.S. 27, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013).
a. Reliance
To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Halliburton Co. v. Erica P. John Fund, Inc. , --- U.S. ----, 134 S.Ct. 2398, 2407, 189 L.Ed.2d 339 (2014) (internal quotations and citation omitted). The reliance requirement "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." Id. (internal quotations and citation omitted). Under a fraud on the market theory, a plaintiff may demonstrate that a presumption of reliance applies if: (1) the alleged misrepresentations were publicly known; (2) the alleged misrepresentations were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed. Id. at 2408 (citing Basic v. Levinson, 485 U.S. 224, 248, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ). The plaintiff has the burden of proving the prerequisites-"namely, publicity, materiality, market efficiency, and market timing"-for invoking the presumption of reliance under the fraud on the market theory have been satisfied, and those prerequisites "(with the exception of materiality) must be satisfied before class certification." Id. at 2412.
Here, Defendants do not dispute the publicity, materiality, or market timing prerequisites have been satisfied. Accordingly, the presumption of reliance applies here if Plaintiff demonstrates the market for UTi common stock was efficient during the Class Period. Id. ; see also In re NetSol Techs., Inc. Sec. Litig. , 2016 WL 7496724, at *5 (C.D. Cal. July 1, 2016) (finding "the only question" as to whether Basic 's presumption of reliance applied was whether the company's stock is traded in an efficient market, where there was no dispute defendants made public statements about the release of a key product and plaintiff traded the company stock during the class period).
Plaintiff relies on an expert report from Cynthia Jones who opines the market for UTi common stock was efficient during the Class Period. Jones applied the five-factor test for evaluating market efficiency set forth in Cammer v. Bloom , 711 F.Supp. 1264 (D.N.J. 1989), and found each of the factors demonstrated market efficiency. (See Jones Report ¶¶ 26-82.) The five Cammer factors include: (1) whether the stock trades at a high weekly volume; (2) whether securities *1121 analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form S-3, as opposed to form S-1 or S-2; and (5) whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." Binder v. Gillespie , 184 F.3d 1059, 1065 (9th Cir. 1999) (quoting Cammer , 711 F.Supp. at 1286-87 ).[1] Defendants do not dispute the first four Cammer factors weigh in favor of finding market efficiency, but argue Plaintiff fails to satisfy its burden of showing market efficiency because Plaintiff only offers Jones's event study as to the fifth Cammer factor, which Defendants contend is unreliable, biased, and flawed.[2]
Plaintiff also offers evidence regarding UTi's market capitalization, the relative size of the bid/ask spread for UTi stock, and the degree to which UTi shares were widely held by the public rather than insiders (Jones Report ¶¶ 46-48, 49-59), which it argues also demonstrate market efficiency.[3] Defendants do not dispute these Krogman factors weigh in favor of finding market efficiency.
Because there is no evidence disputing the first four Cammer factors and the Krogman factors weigh in favor of market efficiency, the Court finds Plaintiff has met its burden of showing market efficiency.[4] See Vinh Nguyen v. Radient Pharm. Corp. , 287 F.R.D. 563, 574 (C.D. Cal. 2012) ("This Court recognizes that Cammer factors are 'an analytical tool, not a checklist' of requirements."); Waggoner v. Barclays PLC , 875 F.3d 79, 99 (2d Cir. 2017) (holding the district court acted within its discretion in finding an efficient market based on the first four Cammer factors and the three Krogman factors where those seven factors were not challenged by defendants, and finding the district court was not required to reach a conclusion concerning the fifth Cammer factor); Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp. , 762 F.3d 1248, 1256 (11th Cir. 2014) (rejecting argument that "a finding of market efficiency always requires proof that the alleged misrepresentations had an immediate effect on the stock price," reasoning although some courts have described the fifth Cammer factor as the most important factor, Regions failed to identify any authority that it is required).[5]
*1122 Even assuming the fifth Cammer factor is required to demonstrate market efficiency, the Court finds Plaintiff demonstrates that factor also weighs in favor of finding market efficiency. To satisfy the fifth Cammer factor, Plaintiff must demonstrate "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." Cammer , 711 F.Supp. at 1287. Plaintiff's expert Jones conducted an event study to test whether the price of UTI common stock responded rapidly to new information. (Jones Report ¶ 61.) Jones tested the difference between the number of significant abnormal returns on "news days" (4/36 = 11.1%) versus those on "no-news days" (5/194 = 2.6%) (id. ¶¶ 74-76), and determined at the 5% level that four of the 36 news days observed (i.e., 11.1%) had statistically significant abnormal returns, and these four returns on "news days" are much higher than the two statistically significant abnormal returns (.05 x 36 = 1.8) that would be expected in a random sampling without any news days (id. ¶ 76). Jones opined it was four times more likely that a statistically significant abnormal return was observed on days when information about UTi entered the market (i.e., on a "news day") than on "no-news days." (Id. ¶ 75, Ex. 13.) Jones also found the difference between the percentage of statistically significant abnormal returns on "news days" as compared to "no-news days" was 8.5%, and concluded the daily price returns demonstrated a significant difference in the occurrence of abnormal returns on "new days" as compared to "no-news days" "at greater than 99 percent confidence." (Id. ¶ 78, Ex. 14.)[6] Jones therefore opined new information concerning UTi was associated with significant changes in UTi's common stock prices and indicates the market for UTi stock was efficient during the Class Period because there is solid statistical evidence that UTi's stock price responded rapidly to new information and did not display significant price changes, overall, in the absence of news. (Id. ¶ 87.)[7]
*1123 Defendants contend the event study performed by Jones is unreliable, biased, and flawed for four reasons discussed below. Defendants argue without Jones's event study, Plaintiff lacks adequate evidence that UTi's stock traded on an efficient market during the Class Period, and therefore individual questions of reliance will predominate which precludes class certification because Plaintiff cannot invoke the presumption of reliance.
First, Defendants argue Jones's event study is unreliable because Jones limited her news search to the Bloomberg archive. Defendants rely on the fact Jones has used other news sources for other cases, and Jones's deposition testimony that she chose Bloomberg because she had access to it on her computer, and does not have access to other news sources without paying a fee (Jones Depo. 58:24-59:5). Defendants cite to no relevant authority which supports their contention the use of one news search archive such as Bloomberg renders an event study unreliable.[8] Moreover, Jones states in her rebuttal report that Bloomberg is a "respected source relied upon in the industry," which "provided a robust sample of news articles" in this case so that Jones did not need to supplement her Bloomberg search with articles from other archives she has used in the past. (Jones Rebuttal Report ¶ 32.) Accordingly, Jones's event study is not unreliable based on her use of Bloomberg.
Second, Defendants argue Jones's event study is unreliable and flawed because it showed UTi stock had a statistically significant excess return on only 11.1% of news days, which Defendants contend is insufficient to support a finding of market efficiency. This fact alone does not render Jones's event study unreliable and flawed. As the Supreme Court has recognized, "[d]ebates about the precise degree to which stock prices accurately reflect public information are ... largely beside the point." Halliburton Co. , 134 S.Ct. at 2410 (noting the presumption of reliance is based "on the fairly modest premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices," and "public information generally affects stock prices"); see also Första AP-Fonden, 312 F.R.D. at 522 ("[R]equiring Lead Plaintiff to offer an event study, before certification, showing that a stock's price responded to news at some specific rate would ignore the Supreme Court's recognition that "[d]ebates about the precise degree to which stock prices accurately reflect public information" are "largely beside the point.") (quoting Halliburton Co. , 134 S.Ct. at 2410 ).[9]
*1124 Third, Defendants argue Jones's event study is unreliable because it does not test the market's response to "new, relevant" information. Defendants' argument goes to the weight, and not the admissibility, of Jones's report. See McIntire , 38 F.Supp.3d at 428. Moreover, Jones opines, and courts have found, engaging in such ex ante determinations as proposed by Defendants would be subjective.[10] See Brown , 2014 WL 12576643, at *7 (finding expert's event study was unreliable where the expert made a subjective determination of which events to examine in his event study by including information he determined was "of the import necessary to change the price of"); In re NII Holdings, Inc. Sec. Litig. , 311 F.R.D. 401, 412 (E.D. Va. 2015) (rejecting defendants' attempt to rebut plaintiff's expert's event study based on defense expert's opinion that plaintiff's expert's conclusions were unfounded because he failed to analyze whether the news released on event days was new or unexpected, reasoning plaintiff's expert's event study avoided bias by using objective measures of event days, and emphasizing "an expert report relying on a study containing cherry-picked event dates is far less persuasive than one in which objective criteria were used"). Accordingly, Defendants fail to demonstrate Jones's study should be entirely disregarded based on Jones's failure to engage in a determination of "new" and "relevant" news ex ante. See, e.g., Loritz v. Exide Techs. , 2015 WL 6790247, at *13 (C.D. Cal. July 21, 2015) (finding plaintiff's expert selected events to be included in his event study using objective criteria for what would qualify as "news" where the expert defined news as Exide-issued press releases and Exide disclosures of financial results before looking at the results, and noting "[i]t was also proper for [plaintiff's expert] to avoid engaging in subjective ex ante evaluations of the studied events"); Vinh Nguyen, 287 F.R.D. at 574 (granting class certification in securities fraud action, and finding although defendants argued plaintiff's expert report should be excluded for using unreliable methods, there was nothing highly misleading in the report and although defendants "may disagree with this analysis, ... that disagreement does not *1125 entitle them to the windfall of excluding the entire report").[11]
Finally, Defendants argue Jones's conclusions are unreliable and should be disregarded because Jones did not apply her own methodology consistently. Specifically, Defendants contend although Jones states she included "all analyst reports as archived by Thomas [sic] Reuters" (Jones Report ¶ 69), Jones did not actually do so.[12] Jones states that "[i]n assembling the analyst reports for inclusion in the News Days, [she] rel[ied] on the analyst research reports archived by Thomson Reuters," but that "not every item on the list [included in her original report] qualifies as an analyst research report." (Jones Rebuttal Report ¶ 33.) Jones explains, "[f]or example, UTi's earnings teleconference transcripts are included on the list, and clearly do not qualify as an analyst research report." (Id. ¶ 33.) Jones further explains, "[t]here are also reports by subscription-only market research firms that [she] did not include in [her] analysis" because: "a. The reports are not prepared by analysts that comprised the 'consensus' earnings estimates and price targets for UTi; b. The reports are not prepared by analysts that participated in the Q & A during UTi's teleconferences with the investment community; and c. The reports contained generalized information about UTi but were not newsworthy ." (Id. ¶ 33 (emphasis added).)[13]
It is unclear what objective criteria Jones used to determine what was "not newsworthy" for purposes of including analyst reports from Thomson Reuters.[14] See, e.g., Brown , 2014 WL 12576643, at *7. While making a determination as to what was "not newsworthy" would appear to include some subjectivity, analyzing what steps Jones's took to minimize the subjectivity of the study in determining what was "not newsworthy" go to weight, not admissibility.
*1126 [15] See In re Diamond Foods, Inc., Sec. Litig. , 295 F.R.D. at 249 ("Factors to consider in determining the probative value of event studies include whether the study is based on a sufficiently large number of observations and the steps taken to minimize the subjectivity of the study.") (emphasis added). Furthermore, courts have recognized that an expert conducting an event study must use her discretion or independent determination in identifying news. See In re Diamond Foods, Inc., Sec. Litig. , 295 F.R.D. at 249 ("In analyzing event studies at the class certification stage, courts have acknowledged that many decision points in designing an event study require some subjectivity") (citing In re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. at 618 ).[16] Moreover, Defendants fail to offer an independent study by their expert[17] or other evidence demonstrating that the market for UTi's stock was not efficient during the Class Period.
Therefore, even if the Court were to find Jones's event study is entitled to lesser weight based on her exclusion of certain analyst reports as "not newsworthy," the Court finds Plaintiff still meets its burden of showing the fifth Cammer factor weighs in favor of finding market efficiency. See Loritz , 2015 WL 6790247, at *15 (finding plaintiffs' evidence demonstrated the fifth Cammer factor favored market efficiency where plaintiffs offered multiple studies providing a causal relationship, and defendants' expert did not submit any studies of *1127 his own); Buttonwood Tree Value Partners, 2013 WL 12125980, at *11 (finding plaintiff's expert's event study wherein the expert concluded that "identified news events explained a substantial and disproportionate portion of the movement in FRB's share price over time, consistent with an informationally efficient market," was sufficient to establish the basic facts of empirical evidence of a cause-and-effect relationship between material events and stock price changes to satisfy the fifth Cammer factor); In re JPMorgan Chase & Co. Sec. Litig. , 2015 WL 10433433, at *6 (S.D.N.Y. Sept. 29, 2015) ("Plaintiffs' event study need not be flawless in order to support a finding of market efficiency. As Defendants' expert offers no opinion on market efficiency through an event study of his own, the fifth Cammer factor can only weigh against Defendants or be neutral. It weighs in Plaintiffs' favor because Defendants have not demonstrated that the work of Plaintiffs' expert is so flawed as to fail to be probative of market efficiency."); Första AP-Fonden , 312 F.R.D. at 522 (finding the plaintiff presented adequate proof that the fifth Cammer factor was satisfied, and therefore the market for defendant's stock was efficient during the class period, where plaintiff's expert conducted an event study and concluded the company's stock price was reacting to news about the company, and defendants' expert could have submitted rebuttal evidence in the form of an affirmative event study but failed to do so).[18]
Accordingly, Plaintiff satisfies its burden of demonstrating the market for UTi stock was efficient, and the presumption of reliance under the fraud-on-the market theory therefore applies. See, e.g., Huberman v. Tag-It Pac. Inc. , 314 Fed.Appx. 59, 63 (9th Cir. 2009) (holding the fraud-on-the-market presumption applied upon finding an efficient market was present where defendant's stock "was traded on a national exchange and stock prices reflected public information," concluding common questions of fact and law therefore predominated over individual questions pursuant to Rule 23(b)(3), and remanding with instructions to grant class certification since the remaining elements necessary for class certification were undisputedly present); In re Countrywide Fin. Corp. Sec. Litig. , 273 F.R.D. at 619 (finding plaintiffs were entitled to the presumption of reliance where plaintiff's expert performed an event study and applied the Cammer factors in concluding the market was efficient, and no defense expert performed a test that showed evidence of inefficiency).[19]
*1128 b. Damages
Defendants also argue the predominance requirement is not satisfied because Plaintiff has failed to articulate a class-wide damages methodology that is consistent with its theory of liability as is required under Comcast Corp. v. Behrend , 569 U.S. 27, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). Defendants rely on their expert Professor Gompers, who opines Jones failed to show she can put forward a class-wide damages methodology that is consistent with Plaintiff's allegations. (Gompers Report ¶¶ 11, 62-86.)
In Comcast, the district court accepted one theory of antitrust liability as capable of class-wide proof, rejected the plaintiffs' remaining three theories of liability, found damages resulting from the one remaining theory of liability could be calculated on a class-wide basis, and certified the class. The Court of Appeals affirmed, but the Supreme Court found the plaintiffs' proposed model failed to measure damages resulting from the particular antitrust injury based on the one remaining theory of liability alone. The Supreme Court stated "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case. 569 U.S. at 35, 133 S.Ct. 1426. The Supreme Court, however, cautioned its decision "should not be read to require, as a prerequisite to certification, that damages attributable to a class-wide injury be measurable on a class-wide basis," and emphasized that "when adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate." Id. at 41, 133 S.Ct. 1426 (internal quotations and citations omitted); see also Pulaski & Middleman, LLC v. Google, Inc. , 802 F.3d 979, 988 (9th Cir. 2015) (noting "differences in damage calculations do not defeat class certification after Comcast ," and holding it is an abuse of discretion to deny class certification on the basis of damages calculation alone).
Here, Plaintiff's expert Jones proposes using an event study and out-of-pocket loss calculation to determine damages on a class-wide basis which is tied to Plaintiff's theory of liability (i.e., artificially inflated prices paid by the Class for UTi stock during the Class Period based on Defendants' alleged misrepresentations/omissions *1129 regarding 1 View and Oracle). (See Jones Report ¶¶ 83, 87; Jones Rebuttal Report 52.). Unlike in Comcast, Plaintiff's proposed damages model is not tied to multiple theories of liability, some of which are no longer at issue in the case. See Comcast, 569 U.S. at 36, 133 S.Ct. 1426 ; Pulaski, 802 F.3d at 988 ("The putative class's problem in Comcast was that the damages model did not isolate damages resulting from any one theory of antitrust impact."). Moreover, courts have recognized the event study/out of pocket method as proposed by Jones is an accepted method for calculating damages in securities fraud class actions.[20] Therefore, Plaintiff meets its burden of demonstrating damages are calculable on a class-wide basis.
* * *
Accordingly, the Court finds Plaintiff satisfies its burden of demonstrating common issues predominate.
Having found Plaintiff has demonstrated the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied, the Court certifies the class, defined as: "all persons and entities who purchased shares of UTi Worldwide, Inc., ("UTi") common stock during the period from March 28, 2013 through February 25, 2014, inclusive, and were damaged by the alleged false and misleading statements. Excluded from the class are Defendants, officers and directors of UTi, members of the immediate families of the Individual Defendants, and affiliates of the corporate Defendant UTi."
D. Appointment of Plaintiff Stratesis, LLC
Plaintiff's Motion also requests that the Court appoint Stratesis, LLC as the Class Representative. Defendants do not oppose this request. Plaintiff presents evidence it is an adequate representative of the Class. Accordingly, the Court grants the request to appoint Stratesis, LLC as the Class Representative.
E. Appointment of Class Counsel
Plaintiff's Motion also requests that the Court appoint Federman & Sherwood as Counsel for the Class. Defendants do not oppose this request. Plaintiff presents evidence that Federman & Sherwood will adequately represent the Class. Therefore, the Court grants the request to appoint Federman & Sherwood as Class Counsel.
*1130 IV. CONCLUSION
Accordingly, the Court GRANTS Plaintiff's Motion for Class Certification.
IT IS SO ORDERED.

The Ninth Circuit has recognized that "Cammer sets out five well-recognized factors designed to help make the central determination of efficiency in a particular market." Miller v. Thane Int'l, Inc. , 615 F.3d 1095, 1103 (9th Cir. 2010) (internal quotations and citation omitted).

Defendants did not file objections to, or a motion to exclude, Jones's report, and instead argue Plaintiff fails to satisfy its burden of showing market efficiency, reliance, and predominance based on Jones's report.

These factors are commonly referred to as the Krogman factors. See Krogman v. Sterritt , 202 F.R.D. 467 (N.D. Tex. 2001).

The fact that UTi common shares were traded on NASDAQ further demonstrates the market for UTi shares was efficient. See Todd , 2017 WL 821662 at *7 (there was a strong indicator of market efficiency based on the fact that STAAR stock was traded on the NASDAQ).

See also Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc. , 2016 WL 4098741, at *10-11 (D. Minn. July 28, 2016) (holding plaintiffs satisfied their burden of establishing defendant's stock traded in an efficient market where all of the Cammer and Krogman factors weighed in favor of market efficiency except the fifth Cammer factor, reasoning that requiring all the Cammer factors to be met would change the factors into a "requirement" or "necessity" which "has not been explicitly endorsed by the courts"); Första AP-Fonden v. St. Jude Med Inc. 312 F.R.D. 511, 520 (D. Minn. 2015) ("A plaintiff's shortfall on the fifth Cammer factor alone does not outweigh, as here, showings on many other relevant factors"); Smilovits v. First Solar, Inc. , 295 F.R.D. 423, 437 (D. Ariz. 2013) (finding plaintiff's showed the market was efficient, reasoning the "standoff" as to the fifth Cammer factor based on empirical evidence submitted by both parties did not outweigh plaintiff's evidence demonstrating three other Cammer factors were satisfied and another Cammer factor was "partially satisfied"); In re Retek Inc. Sec. Litig. , 236 F.R.D. 431, 437 (D. Minn. 2006) (granting motion for class certification where all Cammer factors other than the fifth factor were satisfied, noting the fifth Cammer factor "is not necessary to demonstrate market efficiency").

See also Jones Rebuttal Report ¶ 18 ("The results demonstrated with 99% certainty that the percentage of abnormal returns on news days was significantly greater than the percentage of abnormal returns when no news entered the market.").

Jones also identified three news days for which she found statistically significant abnormal returns. (See Jones Report ¶ 80(a) (Morgan Stanley analyst commented on UTi's September 6, 2013 announcement of its financial results for the second fiscal quarter ending July 31, 2013, which were significantly lower than analysts' consensus estimate and were down 76% year-over-year, and UTi's stock price declined 5.9%); id. ¶ 80(b) (J.P. Morgan published a research report regarding UTi's December 5, 2013 announcement of its financial results for the third fiscal quarter ending October 31, 2013, which reported earnings were in line with analysts' consensus estimates and reported UTi revealed it was on track to achieve $75-95 million in gross annualized pre-tax cost savings and had already achieved $30 million in pre-tax cost savings, and the price of UTi's common stock increased by 5.9% percent on a residual basis which Jones concluded was statistically significant at the 95% confidence level, and increased by 6.2% on an absolute basis); id. ¶ 80(c) (UTi made a corrective disclosure on February 26, 2014, and the one-day residual price decline was 28.9% which was statistically significant at the 95% level of confidence). These examples by Jones further demonstrate a cause and effect relationship between news and an immediate response in UTi's stock price.

Defendants rely solely on Brown v. China Integrated Energy, Inc., 2014 WL 12576643 (C.D. Cal. 2014), in support of their contention. Brown, however, is not relevant regarding this issue because that case did not deal with whether an expert's use of one news search archive rendered its event study unreliable.

See also Buttonwood Tree Value Partners, LP v. Sweeney , 2013 WL 12125980, at *11 (C.D. Cal. Sept. 12, 2013) (finding plaintiff's expert's event study wherein the expert concluded that "identified news events explained a substantial and disproportionate portion of the movement in FRB's share price over time, consistent with an informationally efficient market," was sufficient to establish the basic facts of empirical evidence of a cause-and-effect relationship between material events and stock price changes to satisfy the fifth Cammer factor); Bing Li v. Aeterna Zentaris, Inc. , 324 F.R.D. 331, 343-45, 2018 WL 1147082, at *9-*10 (D.N.J. Feb. 28, 2018) (finding plaintiffs were entitled to the presumption of reliance for purposes of Rule 23's predominance requirement where plaintiff's expert conducted an event study demonstrating an abnormal positive return of 6.14% at a 84% confidence level and concluded there was a statistically significant return on press relate dates, where defendant's expert did not perform an independent event study nor perform a price impact assessment); McIntire v. China MediaExpress Holdings, Inc. , 38 F.Supp.3d 415, 433 (S.D.N.Y. 2014) (rejecting defendants' contention that a finding of market efficiency can occur only when the stock reacts at least 50% of the time to potentially material news regardless of whether the stock price changes more often on news days than on non-news days, and finding plaintiffs "proffered sufficient evidence to satisfy the fifth and most important Cammer factor" based on plaintiffs' expert's event study which comparing the frequency of statistically significant CCME share price reactions on News Days versus Non-News Days," and demonstrated "CCME's stock price was six to eight times more likely to change on News Days than on Non-News Days"); In re Alstom SA Sec. Litig. , 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (finding plaintiffs' evidence sufficiently established the fifth Cammer factor where plaintiffs' expert conducted an event study comparing the day-to-day percentage change in Alstom's share prices that resulted from disclosures of new information, and concluded "Alstom was over 6 times more likely to have a statistically significant stock return on a day with news than on a day with no news").

Jones explains that identifying news value/relevant news up front as suggested by Defendants' expert Professor Gompers would significantly diminish the objectivity of the analysis. (See Jones Rebuttal Report ¶ 25 (stating the premise behind Jones's analysis is to create two unbiased samples of data and make a comparison, and opining if Jones pre-selected a "news day" by first identifying all of the value-relevant news, it would virtually guarantee a higher percentage of abnormal returns in the sample of "news days" as compared to "no-news days" and therefore be biased).)

Professor Gompers opines re-categorizing one day (April 25, 2013) as a "no news" day would change Jones's analysis by bringing the percentage of "news days" with an abnormal stock price return from 11.1% (4/36) down to 8.6% (3/35). (Gompers Report ¶ 29). However, 8.6% is still greater than the 2.6% abnormal stock price return for "no-new days" reported by Jones. (See Jones Report ¶ 75.) See also Halliburton Co. , 134 S.Ct. at 2410 ("Debates about the precise degree to which stock prices accurately reflect public information are thus largely beside the point.").

Professor Gompers opines that including additional reports from Thomson Reuters to Jones's event chronology causes another 13 (days to become "news" days. (Gompers Report ¶ 40.)

See also Jones Rebuttal Report ¶ 34 (explaining Jones "ha[s] been a professional security analyst for more than 25 years and during that period of time ha[s] read thousands of analyst research reports," and that "[a]s one who routinely reviews and relies upon such reports in performing valuation analyses and serving as a litigation consultant in cases such as this one, [she] [is] very familiar with the content and nature of the reports archived by Thomson Reuters."); ids="12581622" index="59" url="https://cite.case.law/s-ct/134/2398/#p2407">id. (stating Jones "also read all of the UTi analyst reports [she] obtained from the search [she] conducted," and "[r]eports from certain subscription-based market research firms were not included in the News/No-News analysis because they did not provide the same level of information to the market as the reports from brokerage firms that were actively following UTi stock during the Class Period."); Jones Depo. 59:6-60:7, 61:4-62:19, 63:11-16 (testifying at deposition that Jones's criteria was to focus on analyst reports that were published by companies activity following UTi during the time period and publishing reports including earnings estimates and investment recommendations, and excluding informational reports which reiterates the company's earnings without providing independent professional analysis and investment recommendations).

At the hearing on the Motion, Plaintiff's counsel represented to the Court that Jones is a financial analyst and that she excluded some reports from the Thomson Routers database that she, as a financial analyst, did not recognize to qualify as an analyst report.

Again, Defendants do not object to, nor seek to exclude, Jones's reports.

See also Brown, 2015 WL 12720322, at *7 ("In analyzing event studies at the class certification stage, courts have acknowledged that 'many decision points in designing an event study require some subjectivity.' ") (citations omitted); In re Countrywide Fin. Corp. Sec. Litig. , 273 F.R.D. at 618 ("identifying news, categorizing which news is 'material,' and determining whether news should have a certain (albeit rough) magnitude of positive or negative influence on price are all subjective determinations."); McIntire, 38 F.Supp.3d at 429 ("The Court notes that an expert who is conducting an event study necessarily must use his or her discretion to define selection criteria that are conducive to the execution of a meaningful multivariate regression analysis."); Billhofer v. Flamel Techs., S.A. , 281 F.R.D. 150, 163 (S.D.N.Y. 2012) (declining to reject plaintiff's expert's conclusions from his event study, finding defendants' expert attack on the criteria which plaintiff's expert used in determining whether or not a particular day in the class period was a news" day for the event study was unavailing because "this aspect of an event study necessarily requires a researcher to make an independent determination").

Defendants' expert Professor Gompers opines Jones's event study cannot be used to "affirmatively establish market efficiency." (Gompers Report at p. 13; see also id. ¶¶ 27-37.) Gompers, however, did not conduct an independent study demonstrating that the market is inefficient and testified he had no opinion as to whether the market for UTi common stock was efficient. (See Gompers Depo. 39:3-18 (testifying he did not conduct an event study of his own); id. 38:11-24 ("Q. Do you have an opinion ... whether the market for UTi stock was efficient ... during the class period in this case? A. No. I have no opinion one way or the other on UTi being inefficient."); id. 38:2-10 (testifying he was not hired as an affirmative expert but was asked to evaluate Jones' report to common on whether she offered sufficient evidence that the market for UTi stock was efficient and whether she offered a framework for damages methodology which could estimate damages on a class-wide basis consistent with the theory of liability and alleged facts of the case). See Första AP-Fonden , 312 F.R.D. at 521 (finding Plaintiff's expert's study was "adequate proof that the market for [defendant's] stock during the putative class period was efficient," and rejecting defense expert's opinion that plaintiff's expert's study "cannot 'by itself' demonstrate market efficiency, and that more analysis is needed to be able to conclude whether the stock traded efficiently," reasoning "[a] study's failure to conclusively prove efficiency ... is different from proving inefficiency").

See also McIntire , 38 F.Supp.3d at 433 (finding plaintiffs "proffered sufficient evidence to satisfy the fifth and most important Cammer factor" based on plaintiffs' experts event study which compared the frequency of statistically significant CCME share price reactions on News Days versus Non-News Days," and demonstrated "CCME's stock price was six to eight times more likely to change on News Days than on Non-News Days"); In re Alstom SA Sec. Litig. , 253 F.R.D. at 280 (finding plaintiffs' evidence sufficiently established the fifth Cammer factor where plaintiffs' expert conducted an event study comparing the day-to-day percentage change in Alstom's share prices that resulted from disclosures of new information and concluded that "Alstom was over 6 times more likely to have a statistically significant stock return on a day with news than on a day with no news").

See also Petrie v. Elec. Game Card, Inc. , 308 F.R.D. 336, 358 (C.D. Cal. 2015) (granting class certification despite finding plaintiffs had "relatively weak evidence of market efficiency, compared to other cases which have found market efficiency" where "[t]he most important cause-and-effect factor weighs only weakly in favor of Plaintiffs," "[o]f the other four Cammer factors, the analyst coverage and Form S-3 eligibility factors weigh against Plaintiffs," "the average weekly trading volume and number of market makers factor weigh somewhat in favor of Plaintiffs," and "[t]he non-Cammer factors [were] also generally a wash," reasoning "[b]ased on the totality of the record, the Court finds that Plaintiffs have nevertheless met their burden of proving that they are entitled to the fraud-on-the-market presumption. Thus, the Rule 23(b) predominance requirement is met."); Middlesex Cty. Ret. Sys. v. Semtech Corp. , 2010 WL 11507255, at *7 (C.D. Cal. Aug. 27, 2010) (finding the fact that defendant's stock was traded on NASDAQ, in combination with the opinion from plaintiff's expert as to the Cammer factors, established that defendant's stock traded in an efficient market and that plaintiff was entitled to the presumption of reliance based on the fraud-on-the-market theory, where defendants only challenged the fifth Cammer factor and argued that plaintiff's expert's methodology was flawed but did not submit any contrary expert testimony); Bing Li , --- F.R.D. at ----, 2018 WL 1147082, at *9-*10 (finding plaintiffs were entitled to the presumption of reliance for purposes of Rule 23's predominance requirement where plaintiff's expert conducted an event study demonstrating an abnormal positive return of 6.14% at a 84% confidence level and concluded there was a statistically significant return on press relate dates, where defendant's expert did not perform an independent event study nor perform a price impact assessment): Första AP-Fonden , 312 F.R.D. at 520-22 (noting defendants' expert did not opine that plaintiff's expert's analyses proved inefficiency, and finding plaintiff presented adequate proof that the market for defendant's stock was efficient during the class period where plaintiff submitted an event study comparing the expected price of defendant's stock on news days and non-news days against its actual price on those days, and found the difference between statistically significant news days and non-news days was statistically significant).

See, e.g., Hatamian v. Advanced Micro Devices, Inc. , 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016) (plaintiff demonstrated damages were sufficiently capable of measurement on a class-wide basis based on a common methodology through use of an out-of-pocket/event study method): In re Lendingclub Sec. Litig. , 282 F.Supp.3d 1171, 1184 (N.D. Cal. 2017) ("Whether plaintiff will ultimately prevail m proving damages...., is not necessary to determine at this stage .... WPERP's proposed method-using an event study-is widely accepted for calculating damages of a class of stockholders.")-In re Silver Wheaton Corp. Sec. Litig. , 2017 WL 2039171, at *15 (plaintiff's proposed methodology for calculating damages through an event study demonstrated damages for every class member were subject to class wide proof; In re Diamond Foods, Inc., Sec. Litig. , 295 F.R.D. at 251 (plaintiff sufficiently demonstrated damages were capable of measurement on a class-wide basis where plaintiff's expert provided an event study that analyzed the impact of defendant's disclosures on the share price, stated damages would "be calculated using an event study analysis similar to the event study analysis" regarding market efficiency, and stated the event study provided demonstrated that "damages [were! calculable on a classwide basis using this standard methodology"); In re Imperial Credit Indus., Inc. Sec. Litig. , 252 F.Supp.2d 1005, 1014 (C.D. Cal. 2003) ("The event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation.") (internal quotations and citations omitted).